**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FORT LAUDERDALE DIVISION**
www.flsb.uscourts.gov

In re:                                                    Chapter 11

Beta Music Group, Inc. and                               Case No. 21-12199-SMG
Get Credit Healthy, Inc.,                                Case No. 21-12201-SMG
                                                         (Jointly Administered)

   Debtors.

_____/

**DEBTORS' MOTION FOR ENTRY OF (1) AN ORDER**
**APPROVING (A) BIDDING PROCEDURES, (B) ASSUMPTION PROCEDURES,**
**(C) THE FORM AND MANNER OF NOTICES, (D) SALE AGREEMENTS WITH**
**STALKING HORSE BIDDER, AND (E) SCHEDULING AN AUCTION, A SALE**
**HEARING, AND ESTABLISHING DATES AND DEADLINES RELATED THERETO;**
**AND (2) AN ORDER (A) AUTHORIZING THE SALE OF SUBSTANTIALLY ALL OF**
**THE DEBTORS' ASSETS, FREE AND CLEAR OF ALL LIENS, CLAIMS, AND**
**ENCUMBRANCES, (B) GRANTING THE PURCHASER THE PROTECTIONS**
**AFFORDED TO A GOOD FAITH PURCHASER, AND**
**(C) GRANTING RELATED RELIEF**

_____

**Proposed Hearing to Consider This Motion: As Soon as Possible**
**Proposed Auction Date: May 6, 2021**
**Proposed Hearing to Approve Sale: May 7, 2021**

Debtors in Possession, Beta Music Group, Inc. ("BEMG") and Get Credit Healthy, Inc.

("GCH", and together with BEMG, the "Debtors"), through undersigned counsel, pursuant to 11

U.S.C. §§ 105(a), 363, 365 and 1123(a)(5)(D), Bankruptcy Rules 2002, 6004, 6006, 9008, 9014,

and Local Rules 6004-1 and 6006-1, request, on an expedited basis, consideration of this motion

to sell substantially all of the assets of GCH and the entry of: (1) an order (the "Bidding Procedures

Order") in the form attached as **Exhibit 1,** approving (a) bidding procedures in the form attached

as **Exhibit 1-A**, (b) assumption procedures, (c) the form and manner of notices in the form attached

as **Exhibit 1-B**, (d) that certain Asset Purchase Agreement, as amended from time to time (the

"Sale Agreement") by and among GCH on one hand, and CredEvolv Services**,** LLC, a Delaware

limited liability company and/or assigns (the "Buyer" or "Stalking Horse Bidder"), on the other

hand, in the form attached as **Exhibit 1-C**, and (e) scheduling an auction, a sale hearing, and establishing dates and deadlines related thereto; and (2) an order (the "Sale Order"): (a) authorizing the sale of the Assets (defined below), free and clear of all liens, claims, and encumbrances, and (b) and granting related relief, in the form attached as **Exhibit 2**. In support of this motion (the "Sale Motion"), the Debtors state:

### *Introduction*

The Debtors filed voluntary petitions under Chapter 11, Subchapter V of the Bankruptcy Code on March 5, 2021 (the "Petition Date"). The Debtors are filing their joint plan of liquidation at the same time as this Sale Motion (the "Plan"). The Plan provides for the sale of substantially all of the assets of GCH to Buyer, subject to higher and better offers, pursuant to sale and bidding procedures to be approved by the Court. The proceeds of the sale will be used to fund the Plan and make payments and distributions in accordance with the priorities under the Bankruptcy Code. This Sale Motion is being filed to establish the procedures for the sale of GCH's assets, as well as to keep the sale on track in the event the Plan is not approved. References may be made in this motion to a sale of the Debtors' assets. That is because the principal asset of BEMG is its ownership in GCH, and the sale contemplates the sale of substantially all of GCH's assets. Therefore, creditors and parties in interest of BEMG are being provided notice of the sale as well as creditors and parties in interest of GCH.

### *Description of Debtors*

BEMG is a holding company and its primary asset is its 100% ownership of GCH.  GCH is an entity that integrates with lenders to provide a conduit through which loan officers can refer applicants who do not qualify for financial products, to non-profit credit counselors. Using propriety processes and software, as well as a partner network of non-profit entities and HUD-

certified credit counselors, GCH provides a mechanism for those who did not qualify for the financial products for which they applied to build credit profiles and receive credit education.

## CONCISE STATEMENT OF THE RELIEF REQUESTED
## PURSUANT TO LOCAL RULE 6004-1(B)

The Debtors seek approval of a sale of substantially all of GCH's assets to the Stalking Horse Bidder, or such other party that makes the highest and best offer at a public auction. The Debtors also request approval of bidding procedures, notice procedures, auction and sale hearing dates, and the terms of the Sale Agreement with the Buyer. In addition, the Debtors request that the Court schedule a hearing to approve the sale to the Successful Bidder, as well as to approve the assumption and assignment of various contracts. For the reasons set forth in this Sale Motion, the Debtors believes a sale of the Assets by public auction is in the best interests of the Debtors and their creditors and should be approved.

### *Summary of the Proposed Sale[1] and Auction Terms*

As more fully detailed in the Sale Agreement, and as summarized below, GCH proposes to enter into a transaction whereby the Buyer will pay $75,000.00, plus cure costs up to $10,000 with respect to executory contracts to be assumed and assigned to the Buyer, to acquire the Assets. The following chart summarizes the terms and conditions of the proposed sale and terms of the proposed auction.

| Terms of Sale | |
|---|---|
| **Term** | **Description** |
| Seller(s) | Get Credit Healthy, Inc. |
| Buyer | CredEvolv Services, LLC and/or assigns. The referenced buyer is not an insider of either of the Debtors. However, Stephen Romano, one of the principals of the |

---

[1] Capitalized terms used herein and not otherwise defined shall have the meanings ascribed to them in the Sale Agreement. To the extent that the summary and terms of the Sale Agreement conflict, the terms of the Sale Agreement shall control.

|  | Buyer owns non-controlling amounts of common and preferred stock in Beta Music Group, Inc. and served as an advisor to the Debtors |
|---|---|
| Purchase Price | $75,000.00 purchase price, plus up to $10,000 to satisfy cure costs with respect to contracts to be assumed and assigned to Buyer. The amount of $25,000 plus the cure costs will be paid in cash, with the balance to be paid over 36 months with simple interest at the rate of 3% per annum pursuant to a promissory note; Buyer shall execute a promissory note at closing. Buyer shall place a $10,000 deposit with counsel for the Debtors. *See* Sale Agreement, Section 2. |
| Description of Property (the "<u>Assets</u>") | All right, title, and interest in and to all of the assets of Seller (except for the Excluded Assets) which in any way are or are intended to be used or usable in the Business, including without limitation all forms of customer and lender lists, detailed customer and lender databases, office and all other equipment, inventory, supplies, accounts receivable, customer and lender relationships, contract rights, information processing hardware and platforms, software (including both source and object code), licenses, know-how, operational documentation, Intellectual Property, websites, technology, trade secrets and property interests, the name "Get Credit Healthy," all trade names, registered and unregistered trademarks, copyrights, domain names, telephone numbers, and online and social media accounts and handles which are owned by, licensed to or used by Seller, and all other properties (tangible and intangible), assets and information necessary or used to conduct the Business. *See* Sale Agreement, Sections 1, 2(a). |
| Warranties | Property is being sold in "as is" condition, with no representations or warranties, other than marketability of title. |
| Sale Order | Entered within 70 days of the Petition Date (May 14, 2021), or such other date as Buyer may designate in writing. |
| Closing Date | The Date that is on or after the 15th day after the entry of an order by the Bankruptcy Court approving the Plan or the sale of the Assets to Buyer, but no later than May 31, 2021. |
| Closing Conditions | Bankruptcy Court approval of sale. Compliance with Sale Agreement, possession and delivery of the Assets free and clear of all liens, claims, encumbrances and other interests (except for those contracts or leases that are assumed and assigned to Buyer). *See* Sale Agreement, Sections 2 and 3. |
| **Auction Terms** | |
| Proposed Auction Date | **May 6, 2021 via Virtual Platform TBD commencing at 10:00 a.m.** to be hosted by the offices of Markowitz Ringel Trusty &Hartog, PA (or such other location as may be designated by the Debtors prior to the Auction with advance notice to all parties in interest entitled to appear at the Auction). |
| Minimum incremental bids | **$5,000** in excess of the highest Qualified Bid (or such other amounts and terms that the Debtors determine will result in the highest and best offer) |
| Initial Overbid Amount | **$80,000.00 + Cure Costs of Assumed Contracts** |
| Proposed Overbid Deadline | **April 30, 2021 at 4:00 p.m.** (Eastern time) |

| Minimum Deposit | **$10,000.00** |
|---|---|
| Documentation Requirements | Submit to the Debtors an executed purchase agreement for the purchase of substantially all of the Assets and assumption of all Assumed Liabilities, which shall be made upon terms and conditions substantially similar to and no less economically favorable to the Debtors then those contained in the Sale Agreements with the Buyer, and must be accompanied by forms of the Sale Agreements that specifically sets forth those amendments and modifications to the Sale Agreements, including price, terms, agreements to be assumed, and liabilities not to be assumed, which such bidder would propose if it were selected as the Successful Bidder; proof of ability to close on the sale; documents showing the Qualified Bidder's good faith |

### *Statement Regarding Personally Identifiable Information*
### *Pursuant to Local Rule 6004-1(B)*

The Sale Agreement contemplates the assumption and assignment of a proprietary software platform which contains personally identifiable information. The Debtors store, but do not utilize the personally identifiable information. Further, GCH has policies regarding the safeguarding of personally identifiable information. The Buyer intends to acquire and utilize GCH's assets in a manner consistent with GCH's use; as such, the proposed sale would not be inconsistent with any such policies regarding safeguarding personally identifiable information, nor would the sale violate the terms of agreements with counter parties relating thereto.

The Debtors submit that a consumer privacy ombudsman is not necessary or required because the Buyer will maintain and preserve the personally identifiable information in a manner consistent with all applicable privacy laws.

### *Known and Potential Lienholders Pursuant to Local Rule 6004-1(B)(7)*

Pursuant to a search of the public records regarding recorded documents, judgment liens, federal liens and UCC filings, the Debtors have identified the following parties that may assert a lien, claim, encumbrance or other interest regarding the Assets:

| Holder of Lien or Interest | Nature and Extent of Lien/Interests | Disputed (Y/N) |
|---|---|---|
| United States Small Business Administration ("<u>SBA</u>") | SBA is the holder of a note and security agreement on the Purchased Assets; SBA filed a UCC-1 | No |

### *Marketing Efforts*

In an effort to further market the Assets, the Debtors propose to provide notice of the proposed auction and sale in the Sun Sentinel, and Miami Herald, and Daily Business Review. In addition, the Debtors shall provide a copy of the sale notice to all parties that previously expressed an interest in acquiring the assets of the Debtors.

Considering the value of the Assets and scope of debt in these cases, the Debtors submit that the proposed dates and deadlines for an auction, sale hearing and entry of a sale order are reasonable. The Debtors estimate the claims in these cases to total approximately $1,300,000 (including disputed claims), and estimate the value of the Assets to total $25,000.00. Additionally, the Debtors' cash flow is insufficient to support a lengthy or expensive sale and marketing process. Furthermore, allocation of the Purchase Price contemplated by the Sale Agreement provides for sufficient amounts to pay all allowed claims and administrative expenses.

The Buyer has agreed to act as a "stalking horse" in connection with a sale to be conducted in accordance with the Bankruptcy Code. The Sale Agreement, which remains subject to the approval of this Court, is attached as **<u>Exhibit 1-C</u>**.

The significant terms of the Sale Agreement are summarized above, so will not be repeated here. ***Parties should review the Sale Agreement in its entirety and not rely solely upon the summaries included herein***.

### *The Bidding Procedures*

The Bidding Procedures provide detail on the date, time, location of the Auction and Sale Hearing, Overbid Requirements, including requirements for a party to become a Qualified Bidder and what constitutes a Qualified Bid, as well as general terms governing the Auction.

As indicated above, the Debtors propose to conduct the auction (the "Auction") on **May 6, 2021 at 10:00 a.m**. via a virtual online platform to be determined, which platform will be sponsored by counsel for the Debtors. The Debtors shall have a court reporter in attendance to transcribe the auction. The Debtors request that the Court schedule a hearing to approve the Auction results on **May 7, 2021**, one-day after the Auction (the "Sale Hearing").

The Bidding Procedures provide that the Stalking Horse Bidder shall be deemed a Qualified Bidder and allows other interested parties to submit Qualified Bids for the Assets. In sum, in order to be considered a "Qualified Bid," a bidder must, prior to the Overbid Deadline, submit: (1) a written offer, (2) a minimum overbid of **$80,000.00 + cure amounts**, (3) a good faith deposit of **$10,000.00**, (4) proof of financial ability to close on the transaction, and (5) proof of the Qualified Bidder's good faith. Bidding at the Auction will be limited to Qualified Bidders who have submitted Qualified Bids in advance of the Overbid Deadline. The Debtors propose that the bidding shall proceed in increments of **$5,000.00**, or such other amounts and terms the Debtors determine will result in the highest and best offer for the Assets. The Bidding Procedures allow for the Debtors, in their business judgment, to select among the Qualified Bids the highest and best offer for the Assets.

The other significant provisions of the proposed bidding procedures are summarized above, and the full provisions are attached as **Exhibit 1-A**, so those provisions will not be repeated here. *Parties should review the proposed Bidding Procedures in their entirety and not rely solely upon the summaries discussed herein*.

**FORM AND MANNER OF NOTICE OF SALE**

Subject to entry of the Bidding Procedures Order, on or within three (3) business days of entry of the Bidding Procedures Order, the Debtors will cause the notice, substantially in the form attached as **Exhibit 1-B** to be served on the following parties or their respective counsel, if known: (a) the Office of the United States Trustee for the Southern District of Florida; (b) the entities listed on the List of Creditors Holding the 20 Largest Unsecured Claims; (c) the SBA; (d) the Buyer; (e) all parties who have expressed a written interest in acquiring some or all of the Debtors' assets; (f) all known holders of liens, claims, and other encumbrances secured by the Assets; (g) all applicable federal, state, and local taxing authorities, including the Internal Revenue Service; (h) all known creditors and equity security holders of the Debtors, as reflected in the Debtors' books and records as of the Petition Date; and (i) any party that has requested notice pursuant to Bankruptcy Rule 2002. The Debtors respectfully submit that the Sale Hearing Notice is reasonably calculated to provide interested parties with notice of the sale and Sale Hearing and an opportunity to respond accordingly.

**ASSUMPTION PROCEDURES**

The Debtors are also seeking approval of procedures (the "Assumption Procedures") to facilitate the fair and orderly assumption and assignment of all executory contracts and unexpired leases subject of the Sale Agreement (the "Assumed Contracts").

The Debtors request that the Court approve (a) the process by which the Debtors will serve notice to affected counterparties (the "Counterparties") regarding the proposed assumption and assignment and related cure amounts, if any, (b) the form of notice in the form attached as part of **Exhibit 1-B** (the "Assumption and Assignment Notice") informing Counterparties of their right and the procedures to object thereto; and (c) the proposed objection and other relevant deadlines

and the manner for resolving disputes relating to the assumption and assignment of the Assumed Contracts to the extent necessary.

The Assumption and Assignment Notice contains a list identifying the Counterparties, the amount, if any, determined by the Debtors to be necessary to be paid (the "Cure Amounts") as of the date of the Assumption and Assignment Notice, the deadline for Counterparties to object, details on what any objection must include, as well as the details on where to file any such objection. The Debtors propose to serve the Assumption and Assignment Notice to the Counterparties by regular U.S. mail, postage prepaid. The Debtors submit that the proposed Assumption Procedures are appropriate under the circumstances, and that service of the Assumption and Assignment Notice shall be sufficient to provide each of the Counterparties notice and an opportunity to be heard regarding the proposed assumption and assignment of the Assumed Contracts.

## LEGAL BASIS FOR REQUESTED RELIEF

**I.    THE COURT SHOULD APPROVE THE SALE OF THE PURCHASED ASSETS PURSUANT TO SECTION 363(b) OF THE BANKRUPTCY CODE.**

1.    Section 363(b) of the Bankruptcy Code provides, in relevant part, that a trustee, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Sales of this nature are generally approved when the Trustee demonstrates that the sale constitutes an exercise of sound "business judgment". See Generally 3 COLLIER ON BANKRUPTCY ¶ 363.02[1][f] (16th ed. 2011). See also In re Diplomat Const., Inc., 2012 WL 5205792, (Bankr. N.D. Ga. September 18, 2012) ("[t]he business judgment test is the prevailing rubric to evaluate the proposed transaction under § 363(b)(1)"); In re Condere Corp., 228 B.R. 615 (Bankr. S.D. Miss. 1998) (business judgment); WBQ P'ship v. Virginia, 189 B.R. 97 (Bankr. E.D. Va. 1995) (best interest of the estate); In re Delaware & Hudson Railway

Co., 124 B.R. 169 (D. Del. 1991); (fair and reasonable price); In re Phoenix Steel, 82 B.R. 334 (Bankr. D. Del. 1987) (fair and equitable transaction).

The "sound business judgment" test requires a trustee to establish: (a) that a sound business reason justifies the sale outside the ordinary course of business, (b) that accurate and reasonable notice has been provided to interested parties, (c) that the trustee has obtained a fair and reasonable price, and (d) good faith.  Id.; In re Phoenix Steel Corporation, 82 B.R. 334, 335 (Bankr. D. Del. 1987); In re Lionel Corp., 722 F.2d 1063, 1071 (2d Cir. 1983).

Here, the Debtors respectfully submit that sound business reasons support their decision to proceed with the Sale Agreement. As set forth above, based upon their assessment of the value of the Assets and debts in these cases, the Purchase Price to be paid by the Buyer is reasonable and will be sufficient to pay the administrative expenses of the estate. In addition, the transaction will enable the Debtors to efficiently and expeditiously exit from Chapter 11. Accordingly, the Debtors believe that the sale of the Assets to the Buyer is an exercise of sound business judgment, is in the best interests of the estate, will allow thousands of individuals to continue to receive credit remediation services from the not-for-profits through the continued servicing of the Debtor's platform, and the proposed transaction should be approved by the Court pursuant to section 363(b) of the Bankruptcy Code.

## II.    THE COURT SHOULD AUTHORIZE THE SALE OF THE PURCHASED ASSETS FREE AND CLEAR OF LIENS, CLAIMS, AND ENCUMBRANCES, AND OTHER INTERESTS PURSUANT TO SECTION 363(f) OF THE BANKRUPTCY CODE.

The Debtors also seek to sell the Assets free and clear of all liens, claims, encumbrances, and other interests pursuant to section 363(f) of the Bankruptcy Code. Section 363(f) of the Bankruptcy Code authorizes a debtor in possession (with powers of a trustee) to sell assets free and clear of any interest in such property if: (a) applicable non-bankruptcy law permits sale of such property free and clear of such interest; (b) such entity consents; (c) such interest is a lien and the

price at which such property is sold is greater than the aggregate value of all liens on such property; (d) such interest is in bona fide dispute; or (e) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest. 11 U.S.C. § 363(f).

Because section 363(f) of the Bankruptcy Code is drafted in the disjunctive, a sale free and clear of liens, claims, and encumbrances may be approved if any one of the aforementioned conditions is met.  See Generally 3 COLLIER ON BANKRUPTCY ¶ 363.06 (16th ed. 2011). See also In re Trans World Airlines, Inc., 322 F.3d 283, 290 (3d Cir. 2003); In re Heine, 141 B.R. 185, 189 (Bankr. D. S.D. 1992); In re Elliot, 94 B.R. 343, 345 (E.D. Pa. 1988); In re James, 203 B.R. 449, 453 (Bankr. W.D. Mo. 1997); In re Shary, 152 B.R. 724, 725 (Bankr. N.D. Ohio 1993); In re Kellstrom Indus., Inc., 282 B.R. 787, 793 (Bankr. D. Del. 2002); In re Decora Indus., Inc., 2002 WL 32332749, at *7; In re Elliot, 94 B.R. 343, 345 (E.D. Pa. 1988); In re Levitt & Sons, LLC, 384 B.R. 630, 647 (Bankr. S.D. Fla. 2008) ("Section 363(f)(3) permits the sale of property free and clear of all liens provided one of its 5 sub-sections is applicable").

Here, the SBA is a creditor that holds a secured lien against the Property. If the SBA consents to the sale, Section 363(f)(2) is satisfied. Even if the SBA does not consent, the SBA and any other parties with liens, claims and interests against the Assets could be compelled in a legal or equitable proceeding to accept money satisfaction of such interest. Accordingly, Section 363(f)(5) is satisfied. Therefore, the Debtors respectfully submit that Section 363(f) of the Bankruptcy Code will be satisfied with respect to the sale of the Assets and, accordingly, request that the Assets be transferred to the Buyer free and clear of all liens, claims, security interests, and encumbrances.

### III.  THE COURT SHOULD GRANT THE BUYER THE FULL PROTECTIONS AFFORDED TO A GOOD FAITH BUYER PURSUANT TO SECTION 363(m) OF THE BANKRUPTCY CODE.

Section 363(m) of the Bankruptcy Code provides, in relevant part: "The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal." 11 U.S.C. § 363(m). Section 363(m) of the Bankruptcy Code thus protects a purchaser of assets sold pursuant to section 363 of the Bankruptcy Code from the risk that it will lose its interest in the purchased assets if the order allowing the sale is reversed on appeal.

Although the Bankruptcy Code does not define "good faith purchaser," the Third Circuit has stated that a good faith purchaser is "one who purchases in 'good faith' and for 'value.'" In re Abbotts Dairies, 788 F.2d 143, 147 (3d Cir. 1986). To constitute a lack of good faith, a party's conduct in connection with the sale usually must amount to "fraud, collusion between the purchaser and other bidders or the trustee or an attempt to take grossly unfair advantage of other bidders." Id. (citing In re Rock Indus. Mach. Corp., 572 F.2d 1195, 1198 (7th Cir. 1978)).

Here, there is no fraud or collusion between the Buyer or the Debtors. The Debtors negotiated an agreement with the Buyer in good faith. The Debtors engaged in arm's-length discussions in negotiating the Sale Agreement. The Debtors and the Buyer were represented by separate counsel in connection with the negotiation and documentation of the Sale Agreement. Accordingly, the Debtors requests that the Court determine that the Buyer has negotiated and acted at all times in good faith and, as a result, is entitled to the full protections of a good faith purchaser under section 363(m) of the Bankruptcy Code, and that the Sale Agreement does not constitute an avoidable transaction pursuant to section 363(n) of the Bankruptcy Code.

## IV.    THE BIDDING PROCEDURES SHOULD BE APPROVED.

The Debtors submit that the Bid Procedures set forth in **Exhibit 1-A** are consistent with the Debtors' business judgment and will provide measurable benefits to the Debtors' estates. The Debtors further submit that the Bid Procedures provide a fair and reasonable means of ensuring that the Assets are sold for the highest or best offer attainable. The Debtors will cooperate fully with any party interested in submitting a competing offer to conduct due diligence in an effort to generate a competing offer. Moreover, the Bid Procedures enable Qualified Bidders to formulate revised bids at the Auction. Based upon the foregoing, the Debtors request the Bid Procedures be approved by the Court as it is in the best interests of the estates.

## V.    THE FORM AND MANNER OF NOTICE OF THE SALE SHOULD BE APPROVED.

Pursuant to Bankruptcy Rule 2002(a), the Debtors are required to provide creditors and parties in interest with at least twenty-one (21) days' notice of the Sale Hearing. Pursuant to Bankruptcy Rule 2002(c), such notice must include the time and place of the Sale Hearing and the deadline for filing any objections to the relief requested herein. As noted above, within three (3) business days of entry of the Bidding Procedures Order, the Debtors will serve the Sale Hearing Notice upon the parties listed hereinabove (including creditors and parties in interest of BEMG). The Debtors submit that the Sale Hearing Notice is reasonably calculated to provide interested parties with notice of the sale and Sale Hearing, and an opportunity to respond accordingly. Therefore, the Debtors submit that service of the Sale Hearing Notice as provided for herein, constitutes good and adequate notice of the sale and the proceedings with respect thereto in compliance with, and satisfaction of, the applicable requirements of Bankruptcy Rule 2002.

## VI.  THE ASSUMPTION AND ASSIGNMENT OF THE ASSUMED CONTRACTS SHOULD BE APPROVED.

### A. The Assumption and Assignment of the Assumed Contracts Reflects the Debtors' Reasonable Business Judgment.

Section 365 of the Bankruptcy Code authorizes a trustee to assume and/or assign executory contracts and unexpired leases, subject to the approval of the Court, provided that the defaults under such contracts and leases are cured and adequate assurance of future performance is provided. *See* 11 U.S.C. § 365. A trustee's decision to assume or reject an executory contract or unexpired lease must only satisfy the "business judgment" standard and will not be subject to review unless such decision is clearly an unreasonable exercise of such judgment. *See, e.g.,* In re Penn Traffic Co., 524 F.3d 373, 383 (2d Cir. 2008) (business judgment test "rather obviously presupposes that the estate will assume a contract only where doing so will be to its economic advantage."); In re Del Grosso, 115 B.R. 136, 138 (Bankr. N.D. Ill. 1990) ("[T]he standard to be applied for approval of the assumption [of an executory contract] is the business judgment standard..."); In re Chira*,* 343 B.R. 361, 366 (Bankr. S.D. Fla. 2006) (considering the business judgment standard in deciding whether to assume executory contract).

Here, the Court should approve the decision to assume and assign the Assumed Contracts in connection with the sale, as a sound exercise of the Debtors' business judgment. First, the Assumed Contracts are part of the value to the Buyer and undoubtedly included in the Buyer's calculation of the appropriate purchase price. As such, they are essential to inducing the best offer for the Assets. Second, it is unlikely that any purchaser would want to acquire any company on a going-concern basis unless a significant number of the contracts and leases needed to conduct the business and manage the day-to-day operations were included in the transaction. Accordingly, the Debtors submit that the assumption and assignment of the Assumed Contracts by way of the Assumption Procedures should be approved as an exercise of their business judgment.

14

**B. Defaults Under the Assumed Contracts Will Be Cured Through the Sale.**

Upon finding that a debtor in possession has exercised its business judgment in determining that assuming an executory contract is in the best interest of its estate, courts must then evaluate whether the assumption meets the requirements of Section 365(b) of the Bankruptcy Code: (a) that a trustee cure, or provide adequate assurance of promptly curing, prepetition defaults in the executory contract; (b) compensate parties for pecuniary losses arising therefrom; and (c) provide adequate assurance of future performance thereunder.

This section "attempts to strike a balance between two sometimes competing interests, the right of the contracting non-debtor to get the performance it bargained for and the right of the debtor's creditors to get the benefit of the debtor's bargain." Matter of Luce Indus., Inc., 8 B.R. 100, 107 (Bankr. S.D.N.Y. 1980), *rev'd on other grounds*, 14 B.R. 529.

The Debtors submit that the statutory requirements of § 365(b)(1)(A) will be satisfied (and promptly) because the Sale Order (once approved) provides a clear process by which to resolve disputes over cure amounts or other defaults. The Debtors are confident that if defaults exist that must be cured, such cure will be achieved fairly, efficiently, and properly, consistent with the Bankruptcy Code and with due respect to the rights of non-Debtor parties.

**C. Non-Debtor Parties Will be Adequately Assured of Future Performance.**

Similarly, the Debtors submit that the third requirement of Section 365(b)(1)(C) of the Bankruptcy Code for the trustee to provide adequate assurance of future performance is also satisfied given the facts and circumstances present here. "The phrase 'adequate assurance of future performance' adopted from section 2-609(1) of the Uniform Commercial Code, is to be given a practical, pragmatic construction based upon the facts and circumstances of each case." In re U.L. Radio Corp., 19 B.R. 537, 542 (Bankr. S.D.N.Y. 1982). Although no single solution will satisfy every case, "assurance of future performance is adequate if performance is likely (i.e. more

probable than not); the degree of assurance necessarily falls considerably short of an absolute guaranty." In re Prime Motor Inns, Inc., 166 B.R. 993, 997 (Bankr. S.D. Fla. 1994). Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. *See* In re Bygaph, Inc., 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance present where a prospective assignee has financial resources and has expressed a willingness to devote sufficient funding to a business to give it a strong likelihood of succeeding).

The Debtors believe that they can and will demonstrate that the requirements for assumption and assignment of the Assumed Contracts to the Buyer will be satisfied. The Debtors submit that the Buyer has the financial wherewithal, willingness, and ability to perform under the Assumed Contracts proposed to be assumed and assigned. Further, the Assumption Procedures provide the Court and other interested parties ample opportunity to evaluate and, if necessary, challenge the ability of the Buyer to provide adequate assurance of future performance and object to the assumption and assignment of the Assumed Contracts or proposed cure amounts. The Court therefore should have a sufficient basis to authorize the Debtors to reject or assume and assign the Assumed Contracts as set forth in the Sale Agreements.

## SATISFACTION OF BANKRUPTCY RULE 6004(h)

To implement the foregoing successfully, the Debtors request that the Court enter an order providing that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h). The Buyer's failure to consummate the sale would prevent the Debtors' estates from realizing significant value from the proposed sale transaction. Therefore, the Debtors request waiver of the 14-day stay period under Bankruptcy Rule 6004(h).

**WHEREFORE**, the Debtors respectfully request that the Court: (1) grant the Sale Motion: (2) enter an order, substantially in the form of the attached **Exhibit 1**, approving (a) bidding procedures in the form attached as **Exhibit 1-A**, (b) assumption procedures, (c) the form and manner of notices in the form attached as **Exhibit 1-B**, (d) the Sale Agreement with Buyer in the form attached as **Exhibit 1-C**, and (e) scheduling an auction, a sale hearing, and establishing dates and deadlines related thereto; (3) enter an order in the form attached as **Exhibit 2**: (a) authorizing the sale of substantially all of the Debtors' assets, free and clear of liens, claims, and encumbrances, (b) granting the Buyer (or Successful Bidder) the protections afforded to a good faith purchaser, and (c) granting related relief; and (4) grant such other and further relief as the Court deems just and proper.

DATED: March 8, 2021

MARKOWITZ RINGEL TRUSTY & HARTOG, P.A.
*Proposed Counsel for Chapter 11 Debtors*
101 NE Third Avenue, Suite 1210
Fort Lauderdale, FL 33301
Tel: (954) 767-0030 // Fax: (954) 767-0035

By: /s/ *Grace E. Robson*
     GRACE E. ROBSON
     Fla. Bar No. 178063
     grobson@mrthlaw.com

17

**EXHIBIT 1**

***PROPOSED BIDDING PROCEDURES ORDER***

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION**
www.flsb.uscourts.gov

In re:                                              Chapter 11

Beta Music Group, Inc. and                          Case No. 21-12199-SMG
Get Credit Healthy, Inc.,                           Case No. 21-12201-SMG
                                                    (Jointly Administered)

      Debtors.
_____ /

**ORDER APPROVING (A) BIDDING PROCEDURES, (B) THE FORM
AND MANNER OF NOTICES, (C) SALE AGREEMENTS WITH STALKING
HORSE BIDDER, INCLUDING PURCHASER PROTECTIONS AND
(D) SCHEDULING AN AUCTION, A SALE HEARING, AND
ESTABLISHING DATES AND DEADLINES RELATED THERETO**

THIS MATTER came before the Court on March _____, 2021 at _____ a.m./p.m. (the

"Bid Procedures Hearing") upon the *Debtors' Motion for Entry of: (1) An Order Approving (A)*

*Bidding Procedures, (B) Assumption Procedures, (C) The Form and Manner of Notices, (D) Sale*

*Agreements with Stalking Horse Bidder; and (E) Scheduling an Auction, a Sale Hearing, and*

*Establishing Dates and Deadlines Related Thereto; and (2) An Order (A) Authorizing the Sale of*

*Substantially All of the Debtors' Assets, Free and Clear of All Liens, Claims, and Encumbrances,*

*(B) Granting the Purchaser the Protections Afforded to a Good Faith Purchaser, and (C) Granting*

*Related Relief* (the "Sale Motion") [ECF No. ___]. The Court, having considered the proposed bidding procedures set forth in the Sale Motion, argument of counsel, and being otherwise informed of the record, finds:

A.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334;

B.      This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), and that this Court may enter a final order consistent with Article III of the United States Constitution;

C.      The venue of this proceeding and the Sale Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409;

D.      The relief requested in the Sale Motion as it relates to the proposed bidding procedures as modified herein is in the best interests of the Debtors' estates, their creditors, and other parties in interest;

E.      Notice of and opportunity for a hearing on the bidding procedures portion of the Sale Motion were appropriate and no other notice need be provided in respect of the proposed bidding procedures;

F.      The Court reviewed the Sale Motion, including specifically the proposed bidding procedures contained therein, and heard the statements in support of the relief requested at the Bid Procedures Hearing; and

G.      The Court has determined that the legal and factual bases set forth in the Sale Motion in respect of the proposed bidding procedures, including the modifications described on the record at the Bid Procedures Hearing and incorporated herein, establish just cause for the relief requested. Accordingly, it is **ORDERED** as follows:

1.      The Motion is **GRANTED**, as set forth herein.

2.      Any objections to the Sale Motion and the relief provided herein solely in respect of the bidding procedures that have not been withdrawn, waived, or settled, and all reservations of rights included therein, hereby are **OVERRULED** and denied on the merits.

3.      The bidding procedures attached to this Order as **Exhibit 1-A** are approved (the "Bidding Procedures").

4.      The Debtors are authorized to execute and deliver the Sale Agreement[1] to the Buyer.

5.      The Auction, if necessary, shall be held on **May 6, 2021 at 10:00 a.m.**, prevailing Eastern Time, via virtual online platform hosted by the offices of Markowitz Ringel Trusty & Hartog, P.A., or such other location as may be designated by the Debtors prior to the Auction with advance notice to all parties in interest entitled to appear at the Auction.

6.      The Court shall conduct a hearing (the "Sale Hearing") to approve the Sale Agreement and sale of the Property to the Buyer if there is no Auction, or to the highest and best bidder at the Auction, on **May    , 2021 at    : a.m./p.m.**, prevailing Eastern Time, or at such other date as may be ordered by the Court. **The Sale Hearing will take place by video conference using the services of Zoom Video Communications, Inc. Zoom will provide a password-protected link for the appropriate Zoom video conference to those who register to participate and who have been approved by the Court. All participants must conduct a prehearing test of Zoom using the same equipment that they intend to use during the hearing. Each person wishing to participate in the hearing by video conference must register for the video conference using the web address provided in the notice of hearing generated by the Court or provided in the Court order scheduling the hearing. Participants must register at least 24 hours prior to the hearing.**

---

[1] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Sale Motion.

7.       Objections, if any, to the sale of the Purchased Assets to the Buyer as contemplated by the Sale Agreements, or the highest and best bidder resulting from the Auction, if applicable, and/or the other relief requested in the Sale Motion must: (a) be in writing; (b) conform to the applicable provisions of the Bankruptcy Rules and the Local Rules; (c) state with particularity the legal and factual basis for the objection and the specific grounds therefor; and (d) be filed with the clerk of the Bankruptcy Court for the Southern District of Florida, Fort Lauderdale Division, First Floor, 299 East Broward Boulevard, Fort Lauderdale, Florida 33301 and served on (i) the proposed counsel for the Debtors: Grace E. Robson, Esq. by email at grobson@mrthlaw.com; and (ii) counsel for the Buyer: Robert J. Borghese, Esq. by email at rjb@borgheselaw.com, in each case, on or before 4:00 p.m. (prevailing Eastern Time), on **April 30, 2021 at 4:30 p.m.**  (the "Sale Objection Deadline").

8.       The form of *Notice of Sale, Auction and Sale Hearing* (the "Sale Notice") and the *Notice to Counterparties to Potentially Assumed and Assigned Executory Contracts and Unexpired Leases* (the "Assumption and Assignment Notice") attached to this Order as **Exhibit 1-B** are approved.  On or before three (3) business days after entry of this Order, the Trustee will cause the Sale Notice to be sent to each of the following entities or their respective counsel, if known: (a) the Office of the United States Trustee for the Southern District of Florida; (b) counsel for the Debtors; (c) the entities listed on the List of Creditors Holding the 20 Largest Unsecured Claims; (d) U.S. Small Business Administration; (e) the Buyer and its counsel; (f) all parties who have expressed a written interest in acquiring some or all of the Debtors' assets; (g) all known holders of liens, claims, and other encumbrances secured by the assets constituting the Purchased Assets; (h) all applicable federal, state, and local taxing authorities, including the Internal Revenue Service; (i) all known creditors and equity security holders of the Debtors, as reflected in the Debtors' schedules and statements; and (j) any party that has requested notice pursuant to

Bankruptcy Rule 2002. In addition, on or before three (3) business days after entry of this Order, the Debtors will cause the Assumption and Assignment Notice to be served to the Counterparties listed in Exhibit A to the Assumption and Assignment Notice.

9.      The Sale Hearing may be adjourned, from time to time, without further notice to creditors or other parties in interest, other than by announcement of said adjournment before this Court at the Sale Hearing.

10.     The form of Sale Agreements with the Buyer is **APPROVED**.

11.     The stays provided for in Bankruptcy Rules 6004(h) and 6006(d) are waived and this Order shall be effective immediately upon its entry.

12.     All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

13.     The Debtors are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order in accordance with the Sale Motion.

14.     This Court retains jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

# # #

**Submitted by:**
Grace E. Robson, Esq.
Markowitz, Ringel, Trusty & Hartog, P.A.
*[Proposed] Counsel for the Chapter 11 Debtors*
101 NE Third Avenue, Suite 1210
Fort Lauderdale, Florida 33301
Tel: (954) 767-0030

**Copies to:**
Grace E. Robson, Esq. *(Attorney Robson is directed to mail a copy of this Order to all interested parties and to file a certificate of service).*

## **EXHIBIT 1-A**

*PROPOSED AUCTION AND BIDDING PROCEDURES*

## GET CREDIT HEALTHY, INC.
## AUCTION AND BIDDING PROCEDURES

The following procedures (the "Bidding Procedures") shall govern the bidding on the auction and sale of substantially all the assets owned by Get Credit Healthy, Inc. (the "Debtor") to CredEvolv Services, LLC and/or assigns (the "Buyer") or the Successful Bidder (as defined below).

1. **Date, Time, and Location of Auction**. If the Debtor receives at least one Overbid from a Qualified Bidder, the Debtor will conduct an Auction on:

   a. Date and Time:      **May 6, 2021 at 10:00 a.m.**
   b. Location:              Virtual Online Platform to be hosted by
                               Markowitz Ringel Trusty & Hartog, P.A.
                               *or such other location that may be designated by the Trustee prior to the Auction upon notice to those parties in interest entitled to attend the Auction.

2. **Date, Time, and Location of Sale Hearing**. The U.S. Bankruptcy Court for the Southern District of Florida, Fort Lauderdale Division, will conduct a hearing (the "Sale Hearing") to approve the sale and the results of the Auction as follows:

   a. Date and Time:      **May _____, 2021 at _____ a.m./ p.m.**

   b. Location:              via Zoom
                               [instructions to be inserted]

3. **Property Being Sold:** All right, title, and interest in and to all of the assets of Get Credit Healthy, Inc. (except for the Excluded Assets) which in any way are or are intended to be used or usable in the Business, including without limitation all forms of customer and lender lists, detailed customer and lender databases, office and all other equipment, inventory, supplies, accounts receivable, customer and lender relationships, contract rights, information processing hardware and platforms, software (including both source and object code), licenses, know-how, operational documentation, Intellectual Property, websites, technology, trade secrets and property interests, the name "Get Credit Healthy," all trade names, registered and unregistered trademarks, copyrights, domain names, telephone numbers, and online and social media accounts and handles which are owned by, licensed to or used by Seller, and all other properties (tangible and intangible), assets and information necessary or used to conduct the Business (collectively, the "Assets").

4. **Due Diligence**. Upon receipt by Markowitz, Ringel, Trusty & Hartog, P.A. ("Debtor's Counsel") of (i) a completed and executed bidder information sheet (to be provided upon request), (ii) an executed non-disclosure agreement, and (iii) evidence satisfactory to the Debtor's Counsel that the potential bidder is reasonably likely to be able to consummate a purchase of the Assets, and if each of the materials described in subclauses (i), (ii), and (iii) are in form and substance satisfactory to the Debtor in its sole discretion, a potential bidder

shall be provided with additional information regarding the Assets, the Debtor's operations and financial condition, and be afforded the opportunity to inspect the Property. In addition, all reasonable efforts will be made to provide a potential bidder, who has satisfied the conditions of this Section 4, with such information as such potential bidder may determine is necessary or relevant to the formulation of its bid. **NEITHER THE DEBTOR'S COUNSEL NOR ANY OF THE DEBTOR'S OTHER PROFESSIONALS HAVE PREPARED ANY OF THE INFORMATION REGARDING THE DEBTOR, OR ANY OF ITS OPERATIONS, ASSETS OR FINANCIAL CONDITION TO BE PROVIDED TO A POTENTIAL BIDDER IN CONNECTION WITH THE PROCEDURES SET FORTH HEREIN. CONSEQUENTLY, NO REPRESENTATION IS MADE BY THE DEBTOR'S COUNSEL OR OTHER AGENTS REGARDING THE ACCURACY, RELIABILITY, VERACITY, ADEQUACY, OR COMPLETENESS OF ANY INFORMATION PROVIDED IN CONNECTION WITH THE BIDDING PROCEDURES, AND ALL POTENTIAL BIDDERS ARE ENCOURAGED TO CONSULT WITH THEIR OWN ADVISORS REGARDING ANY SUCH INFORMATION.**

5. **Overbid Requirements**. Any person interested in purchasing the Assets and making a competitive bid at the Auction must first be deemed a Qualified Bidder by the Debtor by submitting a Qualified Bid (defined below) in conformance with these Bidding Procedures.

   a. Qualified Bidders. To be a Qualified Bidder for the purposes of the Auction, a prospective bidder must, on or before **April 30, 2021 at 4:00 p.m. (Eastern Time)** (the "Overbid Deadline") provide the following:

      i. Written Offer. Each prospective bidder shall submit to Debtor's counsel, Grace E. Robson, Esq., Markowitz Ringel Trusty & Hartog, P.A. via email grobson@mrthlaw.com, an executed purchase agreement for the purchase of the Assets and assumption of all Assumed Liabilities, which shall be made upon terms and conditions substantially similar to and no less economically favorable to the Debtor's estate than those contained in the Sale Agreement with the Buyer, and must be accompanied by blacklined form of the Sale Agreement that specifically sets forth those amendments and modifications to the Sale Agreement, including price, terms, agreements to be assumed, and liabilities not to be assumed, which such bidder would propose if it were selected as the Successful Bidder (the "Competing Offer");

      ii. Minimum Overbid. The Competing Offer must be for a minimum bid ("Minimum Overbid") that is at least **$80,000.00, plus any amounts necessary to cure defaults on contracts or leases to be assumed and assigned under the Competing Offer**;

      iii. Good Faith Deposit. The Competing Offer must include an initial deposit submitted by the Overbid Deadline, in cash or certified funds, in an amount equal to at least **$10,000.00** (the "Deposit"), to be held in the trust account

of Markowitz Ringel Trusty & Hartog, P.A., 9130 So. Dadeland Boulevard, Suite 1800, Miami, Florida 33156 (the "Escrow Agent");

    iv.  <u>Proof of Ability to Close</u>. Each prospective bidder shall submit to Debtor's Counsel evidence of the bidder's financial ability to consummate its purchase of the Property  under and upon the terms and conditions of Competing Offer, including proof of adequate assurance of future performance in connection with any leases or contracts being acquired as part of the Competing Offer;

    v.  <u>Qualified Bidders' Obligation to Provide Evidence Regarding Good Faith</u>. Each prospective bidder shall provide the Debtor's Counsel evidence in the form satisfactory to the Debtor's Counsel of such bidder's good faith in connection with the Competing Bid, within the meaning of Section 363(m) of the Bankruptcy Code at or before the Auction.

b.  <u>Identifying Qualified Bidders</u>. No prospective bidder shall be permitted to attend or bid at the Auction unless such prospective bidder is deemed a Qualified Bidder as set forth herein. No later than one (1) business day prior to the Auction, the Debtors shall determine which prospective bidder(s) constitute a Qualified Bidder, and shall therefore be determined to be a qualified competitive bid, including any later bids that such Qualified Bidder may make at and during the Auction. The Buyer shall be deemed a Qualified Bidder;

c.  <u>Disposition of Deposit</u>. A Qualified Bidder's deposit, without any accrued interest, shall be returned to a Qualified Bidder if such party's Qualified Bid is not approved by the Bankruptcy Court as the Successful Bid (as defined below). In the event such Qualified Bid is approved by the Bankruptcy Court as the Successful Bid, but the Qualified Bidder fails to timely close its purchase of the Assets, then the deposit of such Qualified Bidder shall immediately thereafter be forfeited and become property of the bankruptcy estate;

d.  <u>Terms of Auction</u>. The terms of the Auction shall be for "cash" or cash equivalent payable in accordance with the terms of the Sale Agreements with the Buyer, or such agreements with the Successful Bidder approved by the Bankruptcy Court. Further, the Qualified Bid of any Qualified Bidder shall not be subject to any due diligence or any other contingency whatsoever, except for Bankruptcy Court approval and as otherwise contained in the any applicable agreement submitted with in connection with such Qualified Bid, and any such Qualified Bid must not have a financing contingency. All Qualified Bids must include a detailed description of the sources and relevant amounts of equity or debt financing. If financing shall be provided by external sources, a Qualified Bid must include copies of relevant commitment letters and identify the individuals (and their phone numbers) at the institutions involved so that Debtor (or its counsel) may contact them;

e.  <u>Terms of Qualified Bid</u>. A Qualified Bid must state that (i) it constitutes a binding offer and shall remain in effect through the Closing Date of the Successful Bid, and (ii) the Qualified Bidder is prepared to consummate the transaction under the Sale Agreements or any applicable Agreement on the Closing Date after the entry of an order of the Bankruptcy Court approving the Qualified Bid;

f.  <u>Bidding</u>. In the event that the Debtor receives one or more Qualified Bids, an Auction will be conducted. The Buyer shall be given copies of all Qualified Bids prior to the start of any Auction. Bidding at the Auction shall be limited to the Buyer and those Qualified Bidders who have submitted Qualified Bids. Commencing with the highest and best Qualified Bid (as determined by the Trustee), competitive bidding among Qualified Bidder(s) shall proceed in increments of **$5,000** in excess of the highest Qualified Bid (or such other amounts and terms that the Debtors determine will result in the highest and best offer), with such competitive bidding to continue until the highest and best bid to purchase the Assets is received in the exercise of the Debtor's business judgment. The highest and best Qualified Bid shall be recommended by the Debtor to the Bankruptcy Court for approval (the "Successful Bid" and the "Successful Bidder");

g.  <u>Back-up Bidder</u>. Upon the conclusion of the Auction, the Debtor shall have the right (but not the obligation) to designate the second highest and best Qualified Bid as the "Back-up Bid" and the party making the Back-up Bid as the "Back-up Bidder." By submitting a Qualified Bid, each Qualified Bidder is subject to being designated a Back-up Bidder by the Debtors. If, for any reason, the Successful Bidder is unable or unwilling to timely perform its obligations under the terms of the Successful Bid, the Debtor, in the exercise of its business judgment, may sell the Assets to the Back-up Bidder without further notice or a hearing and said Back-up Bidder shall be obligated to close its purchase of the Assets according to the terms of its Back-up Bid and, as the case may be, the terms and conditions of the Sale Agreement or the applicable Competing Offer. The Back-up Bidder shall remain a Back-up Bidder through the date that is ten (10) business days after the termination of the applicable sale agreements with the Successful Bidder.

6.  **General Terms of Sale**:

a.  <u>Highest and Best Offer</u>. The Assets will be sold to the Qualified Bidder(s) making the highest and best bid on the Assets;

b.  <u>Firm Offers</u>. All bids shall be "firm offers" and shall not contain any contingencies to the validity, effectiveness, and/or binding nature of the offer, including, without limitation, contingencies for financing, due diligence or inspection, except for the conditions to closing provided for in the Sale Agreements or agreements submitted with the applicable Qualified Bid;

c. <u>Requirement for Qualified Bidders to Appear at Auction and Sale Hearing</u>. All Qualified Bidders shall personally appear (via the selected virtual platforms)at the online Auction and the Sale Hearing, or through a duly authorized representative;

d. <u>Non-Conforming Bids Disqualified from Auction</u>. Any entity that fails to submit a timely, conforming Qualified Bid, as set forth above, shall be disqualified from bidding for the Purchased Assets at the Auction. In addition, the Debtor  is not required to entertain any bids that are not more favorable to the Debtor's estate than the Sale Agreement;

e. <u>The Debtor's Business Judgment</u>. The Debtor: (a) may exercise its business judgment to recommend a sale of the Assets to any Qualified Bidder whose bid the Debtor determines to be highest or best and in the best interests of the Debtor's estate; and (b) shall consult with any significant constituent it deems necessary in connection with the bidding process and the selection of the highest or otherwise best bid. In exercising its business judgment as to which bid constitutes the highest or otherwise best bid, the Debtor may consider all factors which the Debtor deems relevant, including but not limited to, the terms and conditions of the Sale Agreement, the bidder's ability to close the proposed transaction, the scope of the proposed transaction, the form and market value of any non-cash consideration offered, the aggregate value of any assets not included in such bid and the Debtor's ability to recognize such value, and the costs to the Debtor's estate of any bid. Each Qualified Bidder should be prepared to make its best and final offer at the Auction, and the Debtor reserves all rights to object to and oppose any request for a continuance or recess of the Sale Hearing;

f. <u>No Warranties</u>. The sale of the Assets will be on an "as is, where is" basis, with all faults, without any representations or warranties by the Debtor, except as otherwise set forth in the Sale Agreement, but free and clear of all liens, claims, and encumbrances, with such liens, claims, and encumbrances to attach to the proceeds of the sale;

g. <u>Jurisdiction</u>. All Qualified Bidders shall be deemed to have consented to the core jurisdiction of the Bankruptcy Court and to have waived any right to jury trial in connection with any disputes relating to the Auction and/or the Sale of the Assets;

h. <u>Bankruptcy Court Approval</u>. The Sale shall be subject to approval of the Bankruptcy Court at the Sale Hearing and the Sale Order shall be in form and substance reasonably satisfactory to the Debtor and the Successful Bidder;

i. <u>Additional Terms</u>. The Debtor may, at, before, or during the Auction, impose such other and additional terms and conditions not inconsistent with these Bid Procedures as it reasonably determines to be in the best interest of the Debtor's estate, creditors, or other parties in interest;

j.  <u>Headings</u>. The headings of all sections of these Bid Procedures are inserted solely for the convenience of reference and are not a part of and are not intended to govern, limit or aid in the construction or interpretation of any term or provision hereof.

*[End of Document]*

## EXHIBIT 1-B

*PROPOSED SALE NOTICE*
*And*
*PROPOSED ASSUMPTION AND ASSIGNMENT NOTICE*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FORT LAUDERDALE DIVISION**
www.flsb.uscourts.gov

| | |
|---|---|
| In re: | Chapter 11 |
| | |
| Beta Music Group, Inc. and | Case No. 21-12199-SMG |
| Get Credit Healthy, Inc., | Case No. 21-12201-SMG |
| | (Jointly Administered) |
| Debtors. | |

_____ /

## NOTICE OF SALE, AUCTION, AND SALE HEARING

*PLEASE TAKE NOTICE THAT* on March ____, 2021, Beta Music Group, Inc. and Get Credit Healthy, Inc. (the "Debtors") filed the *Debtors' Motion for Entry of (1) An Order Approving (A) Bidding Procedures, (B) Assumption Procedures, (C) The Form and Manner of Notices, (D) Sale Agreements With Stalking Horse Bidder and (E) Scheduling an Auction, a Sale Hearing, and Establishing Dates and Deadlines Related Thereto; and (2) An Order (A) Authorizing the Sale of Substantially All of the Debtors' Assets, Free and Clear of All Liens, Claims, and Encumbrances, (B) Granting the Purchaser the Protections Afforded to a Good Faith Purchaser, and (C) Granting Related Relief* (the "Sale Motion") [ECF No. ___]. The Sale Motion seeks to sell substantially all of the assets of Get Credit Healthy, Inc. (the "Assets") by public auction, free and clear of all liens, claims, and encumbrances pursuant to 11 U.S.C. §§ 363(b) and (f) to the party making the highest and best bid (the "Successful Bidder"). Additionally, the Sale Motion seeks to, among other things: (1) approve the proposed sale and bidding procedures (the "Bidding Procedures"); (2) schedule a hearing to approve the bid procedures; (3) approve the form and notice of sale; (4) schedule an auction; (5) schedule a hearing to approve the sale; (6) approve the assumption procedures, and (7) approve the forms of Sale Agreements to be used in connection with the sale.

On March ____, 2021, the United States Bankruptcy Court for the Southern District of Florida approved the Bidding Procedures included in the Sale Motion in that certain Order, dated March _____, 2021 [ECF No. ____] (the "Bidding Procedures Order"). All interested parties should carefully read the Bidding Procedures Order and the Bidding Procedures. Copies of these documents are available upon email request made to the Debtors' attorney (information below). A separate notice will be provided to counterparties to executory contracts that the Debtor may assume and assign in connection with the sale.  Pursuant to the Bidding Procedures Order, the Court authorized the Debtors to conduct an auction, if necessary, to determine the highest or best offer for the Assets on **May ___, 2021 at ___ a.m./p.m.**, (the "Auction") by virtual online platform hosted by the offices of Markowitz Ringel Trusty & Hartog, P.A.[1] Parties interested in receiving information regarding the Auction should contact counsel for the Debtors, Grace E. Robson, Esq., Markowitz Ringel Trusty & Hartog, P.A. by telephone at (954) 767-0030 or by email at grobson@mrthlaw.com.

_____

[1] Or such other location as the Debtors may designate prior to the Auction.

The deadline to submit a Qualified Bid for the Assets is April 30, 2021 by 4:00 p.m. (ET) (the "Bidding Deadline"). Only parties that have submitted a Qualified Bid in accordance with the Bidding Procedures prior to the Bidding Deadline may participate in the Auction.

Unless adjourned in accordance with the Bidding Procedures Order or other order of the Court, the hearing to consider the approval of the sale of the Assets to the Successful Bidder, free and clear of all liens, claims, and encumbrances, will be held before the Honorable Scott M. Grossman, United States Bankruptcy Judge, on **May       , 2021 at      a.m./p.m.** by **Zoom Video Conference** (the "Sale Hearing"). The Sale Hearing may be continued from time to time without further notice to creditors or parties in interest other than by announcement of the continuance in open court on the date scheduled for the Sale Hearing. The video conference will be conducted using the services of Zoom Video Communications, Inc. Zoom will provide a password-protected link for the appropriate Zoom video conference to those who register to participate and who have been approved by the Court. All participants must conduct a prehearing test of Zoom using the same equipment that they intend to use during the hearing. **Each person wishing to participate in the hearing by video conference must register for the video conference using the web address provided in the notice of hearing generated by the Court or provided in the Court order scheduling the hearing. Participants must register at least 24 hours prior to the hearing.**

Objections, if any, to the sale of the Assets, or the relief requested in the Sale Motion must: (1) be in writing; (2) comply with all applicable Federal Rules of Bankruptcy Procedure and/or Local Rules; (3) be filed with the Clerk of the Bankruptcy Court, United States Courthouse, 299 East Broward Boulevard, Room 112, Fort Lauderdale, Florida 33301, or filed electronically via CM/ECF, on or before **4:00 p.m. on April 30, 2021**, or such other time as the Debtors may agree upon; and (4) be served so as to be received no later than 4:00 p.m. on the same day, upon (i) counsel to the Debtors, Grace E. Robson, Esq., Markowitz Ringel Trusty & Hartog, P.A., 101 NE Third Avenue, Suite 1210, Fort Lauderdale, Florida 33301, Tel. (954) 767-0030, or by email at grobson@mrthlaw.com; and (ii) counsel for the Buyer, Robert J. Borghese by email at rjb@borgheselaw.com.

This Notice is subject to the terms and conditions of the Bidding Procedures Order and the Bidding Procedures, which shall control in the event of any conflict. The Debtors encourage parties in interest to review such documents in their entirety. Copies of the Sale Motion, the Bidding Procedures, and/or the Bidding Procedures Order may be obtained upon written request to counsel and the Debtors, Grace E. Robson, by email at grobson@mrthlaw.com. In addition, copies of the aforementioned pleadings may be found on the internet at http://ecf.flsb.uscourts.gov.

**PLEASE TAKE FURTHER NOTICE THAT YOU ARE RECEIVING THIS SALE HEARING NOTICE BECAUSE YOU ARE A CREDITOR, EQUITY SECURITY HOLDER OR CONTRACT COUNTERPARTY OF THE DEBTORS, OR OTHERWISE HAVE BEEN IDENTIFIED BY THE DEBTORS AS AN ENTITY WITH A PARTICULARIZED INTEREST IN THE SALE HEARING, AND THAT ANY PARTY OR ENTITY WHO FAILS TO TIMELY MAKE AN OBJECTION TO THE SALE ON OR BEFORE THE SALE OBJECTION DEADLINE IN ACCORDANCE WITH THE SALE MOTION SHALL BE FOREVER BARRED FROM ASSERTING ANY OBJECTION TO**

**THE SALE, INCLUDING WITH RESPECT TO THE TRANSFER OF THE DEBTORS' ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS.**

DATED: _____, 2021

**MARKOWITZ RINGEL TRUSTY & HARTOG, P.A**.
*[Proposed] Counsel for the Chapter 11 Debtors*
101 NE Third Avenue, Suite 1210
Fort Lauderdale, FL 33301
Tel: (954) 767-0030 // Fax: (954) 767-0035

By: */s/ Grace E. Robson*
    Grace E. Robson, Esq.
    Fla. Bar No. 178063
    grobson@mrthlaw.com

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FORT LAUDERDALE DIVISION**
www.flsb.uscourts.gov

In re:                                          Chapter 11

Beta Music Group, Inc. and                      Case No. _____
Get Credit Healthy, Inc.,                       Case No. _____
                                                (Jointly Administered)

     Debtors.
_____ /

**NOTICE TO COUNTERPARTIES TO POTENTIALLY**
**<u>ASSUMED EXECUTORY CONTRACTS AND UNEXPIRED LEASES</u>**

> YOU ARE RECEIVING THIS NOTICE BECAUSE YOU OR ONE OF YOUR AFFILIATES IS A COUNTERPARTY TO AN EXECUTORY CONTRACT OR UNEXPIRED LEASE WITH ONE OR MORE OF THE DEBTORS AS SET FORTH ON **EXHIBIT A** ATTACHED HERETO

     **PLEASE TAKE NOTICE** that, on _____, 2021, the United States Bankruptcy Court for the Southern District of Florida entered an order (the "Bidding Procedures Order") [ECF No. ___] approving, among other things, the bidding procedures for the sale of substantially all of the assets (the "Assets") of Get Credit Healthy, Inc. (the "Debtor"), including the procedures for the assumption and assignment of executory contracts and unexpired leases by the Debtor, to CredEvolv, LLC (the "Buyer") or to the Successful Bidder in connection therewith.

     **PLEASE TAKE FURTHER NOTICE** that, pursuant to the Sale Motion [ECF No. ____], the debtors may assume and assign to the Buyer or the Successful Bidder the contracts and leases listed on **Exhibit A** to this notice (the "Cure Notice") to which you are a counterparty. Exhibit A identifies the contract or lease proposed to be assumed and assigned as well as the proposed cure amount that the Trustee believes must be paid in order to assume the contract or lease (the "Cure Amount").

     **PLEASE TAKE FURTHER NOTICE** that, if you disagree with the proposed Cure Amount, or the proposed assumption and assignment of the contract or lease, your objection must (i) be in writing; (ii) comply with the applicable provisions of the Bankruptcy Rules, Local Bankruptcy Rules; (iii) state with specificity the nature of the objection and, if the objection pertains to the proposed Cure Amount, the correct cure amount alleged by the objecting counterparty, together with any applicable and appropriate documentation in support thereof; and (iv) be filed with the Bankruptcy Court and served so as to be actually received by no later than **April 30, 2021, at 4:00p.m. Eastern Time** (the "Objection Deadline") by the Bankruptcy Court and the following parties as follows:

| **Bankruptcy Court** |
|:---:|
| United States Bankruptcy Court, Clerk of Court |
| United States Courthouse |
| 299 East Broward Boulevard, Room 112 |
| Fort Lauderdale, FL 33301 |

| |
|---|
| Tel: 954-769-5700 |
| *Limited Operations – Check www.flsb.uscourts.gov |
| **Counsel to Debtor(s)** |
| Grace E. Robson, Esq. |
| Email: grobson@mrthlaw.com |
| |
| **Counsel to Buyer** |
| Robert J. Borghese |
| Email: rjb@borgheselaw.com |

**PLEASE TAKE FURTHER NOTICE** that any objections filed by the Objection Deadline shall be heard by the Bankruptcy Court on **_____, 2021 at _____ a.m./p.m. by Zoom Videoconference**. The video conference will be conducted using the services of Zoom Video Communications, Inc. Zoom will provide a password-protected link for the appropriate Zoom video conference to those who register to participate and who have been approved by the Court. **All participants must conduct a prehearing test of Zoom using the same equipment that they intend to use during the hearing. Each person wishing to participate in the hearing by video conference must register for the video conference using the web address provided in the notice of hearing generated by the Court or provided in the Court order scheduling the hearing. Participants must register at least 24 hours prior to the hearing.**

**PLEASE TAKE FURTHER NOTICE** that, nothing herein (i) alters in any way the prepetition nature of the contracts and leases or the validity, priority or amount of any claims of a counterparty to any contract or lease against the Debtors that may arise under such contract or lease, (ii) creates a post-petition contract or agreement or (iii) elevates to administrative expense priority any claims of a counterparty to any contract or lease against the Debtors that may arise under such contract or lease.

**This Notice is not an admission by the Debtors that such contract or lease is executory or unexpired.**

Dated: _____, 2021

Markowitz Ringel Trusty & Hartog, PA
[Proposed] Counsel for the Chapter 11 Debtors
101 NE Third Avenue, Suite 1210
Fort Lauderdale, FL 33301
T: (954) 767-0030 // F: (954) 767-0035

By: */s/ Grace E. Robson*
    GRACE E. ROBSON
    Fla. Bar No. 0178063
    grobson@mrthlaw.com

**Exhibit A**
**Proposed Cure Amounts**[1]

| Party to Lease/Contract | Description of Lease/Contract | Proposed Cure Amount |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

---

[1] The Debtors reserve the right to dispute or otherwise revise the cure amounts listed. The cure amounts were calculated based upon preliminary information gathered by the Debtors.

# EXHIBIT 1-C

### *SALE AGREEMENT*

DocuSign Envelope ID: 4265D572-8A56-410B-836B-E1E4CB9D56B1

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (the "Agreement") is made and entered on March 5, 2021 (the "Execution Date") to be effective as of 12:01 A.M. on the Closing Date (as defined below) (the "Effective Date"), by and between CredEvolv Services LLC, a Delaware limited liability company ("Buyer"), and Get Credit Healthy, Inc., a Florida corporation ("Seller"). Buyer and Seller are referred to individually as a "Party" and collectively as the "Parties."

## BACKGROUND

Seller provides financial technology platforms and services to a partner network of FICO, non-profit, and HUD-certified credit counselors and lenders that enable them to assist and provide education to consumers who do not qualify for a variety of financial products because of their credit profiles with the goal of qualifying those consumers for the financial products for which they applied (the "Business").

Buyer is interested in acquiring the Business by purchasing substantially all of the assets of Seller in connection with the Business, and Seller is interested in selling those assets to Buyer all in accordance with the terms and conditions of this Agreement.

Seller desires to sell, transfer and assign to Buyer, and Buyer desires to purchase from Seller, pursuant to sections 105, 363 and 365 of the Bankruptcy Code (as defined herein), substantially all of the assets used in the Business upon the terms and conditions set forth in this Agreement.

The transactions contemplated herein are subject to the approval of the Bankruptcy Court (as defined and described below) and will be consummated only pursuant to the Sale Order (as defined and described below) to be entered in the Bankruptcy Case (as defined and described below).

## TERMS

NOW THEREFORE, for and in consideration of the premises and the mutual promises herein made, and in consideration of the representations, warranties, and covenants contained in this Agreement, the Parties intending to be legally bound, hereby agree as follows:

1.  Definitions.

"Acquired Assets" means all right, title, and interest in and to all of the assets of Seller (except for the Excluded Assets) which in any way are or are intended to be used or usable in the Business, including without limitation those assets listed on Exhibit A and all forms of customer and lender lists, detailed customer and lender databases, the Assigned Contracts, office and all other equipment, inventory, supplies, accounts receivable, customer and lender relationships, contract rights, information processing hardware and platforms, software (including both source and object code), licenses, know-how, operational documentation, Intellectual Property, websites, technology, trade secrets and property interests, the name "Get Credit Healthy," all trade names, registered and unregistered trademarks, copyrights, domain names, telephone numbers, and online and social media accounts and handles which are owned by, licensed to or used by Seller, and all other properties (tangible and intangible), assets and information necessary or used to conduct the Business.

"Adverse Consequences" means all actions, suits, proceedings, hearings, investigations, charges, complaints, claims, demands, injunctions, judgments, orders, decrees, rulings, damages, dues, penalties, fines, costs, amounts paid in settlement, Liabilities (including accounts payable), obligations, Taxes, liens, losses, expenses, and fees, including court costs and reasonable attorneys' fees and expenses.

1

DocuSign Envelope ID: 4265D572-8A56-410B-836B-E1E4CB9D56B1

"<u>Assigned Contracts</u>" means those agreements that are being assigned by Seller to Buyer as specified on Exhibit B.

"<u>Bankruptcy Case</u>" means the bankruptcy case commenced by Seller upon the filing of a voluntary petition under Chapter 11 of the Bankruptcy Code.

"<u>Bankruptcy Code</u>" means Title 11 of the United States Code, 11 U.S.C. §§101 *et seq.*

"<u>Bankruptcy Court</u>" means the United States Bankruptcy Court for the Southern District of Florida, Fort Lauderdale division, where the Bankruptcy Case is pending.

"<u>Basis</u>" means any past or present fact, situation, circumstance, status, condition, activity, practice, plan, occurrence, event, incident, action, failure to act, or transaction that forms or could form the basis for any specified consequence.

"<u>Business</u>" has the meaning set forth in the preface above.

"<u>Buyer</u>" has the meaning set forth in the preface above.

"<u>Closing</u>" has the meaning set forth in Section 2(d) below.

"<u>Closing Date</u>" has the meaning set forth in Section 2(d) below.

"<u>Code</u>" means the Internal Revenue Code of 1986, as amended.

"<u>Confidential Information</u>" means any information concerning the business and affairs of Seller that is not already generally available to the public.

"<u>Deposit</u>" has the meaning ascribed in Section 2(c) below.

"<u>Disclosure Schedule</u>" has the meaning set forth in Section 4 below.

"<u>Employee Benefit Plan</u>" means any "employee benefit plan" (as such term is defined in ERISA Section 3(3)) and any other employee benefit plan, program or arrangement of any kind.

"<u>Environmental, Health, and Safety Requirements</u>" means all federal, state, local and foreign statutes, regulations, ordinances and other provisions having the force or effect of law, all judicial and administrative orders and determinations, all contractual obligations and all common law concerning public health and safety, worker health and safety, and pollution or protection of the environment, including without limitation all those relating to the presence, use, production, generation, handling, transportation, treatment, storage, disposal, distribution, labeling, testing, processing, discharge, release, threatened release, control, or cleanup of any hazardous materials, substances or wastes, chemical substances or mixtures, pesticides, pollutants, contaminants, toxic chemicals, petroleum products or byproducts, asbestos, polychlorinated biphenyls, noise or radiation, each as amended and as now or hereafter in effect.

"<u>ERISA</u>" means the Employee Retirement Income Security Act of 1974, as amended.

"<u>Excluded Assets</u>" means those enumerated assets not being acquired by Buyer from Seller.

"<u>Financial Statement</u>" has the meaning set forth in Section 4(g) below.

"<u>GAAP</u>" means United States generally accepted accounting principles as in effect from time to time.

DocuSign Envelope ID: 4265D572-8A56-410B-836B-E1E4CB9D56B1

"<u>Information Privacy and Security Laws</u>" means any applicable laws issued by a governmental entity and all guidance issued by any governmental entity thereunder, relating to: (a) the privacy, protection, or security of Protected Information, including as relevant to the collection, storage, processing, transfer, sharing and destruction of Protected Information or (b) requirements for websites and mobile applications, online behavioral advertising, call or electronic monitoring or recording, or any outbound communications, including outbound calling and text messaging, telemarketing and email marketing. Without limiting the foregoing, "Information Privacy and Security Laws" includes the Federal Trade Commission Act, the Telephone Consumer Protection Act, the Telemarketing and Consumer Fraud and Abuse Prevention Act, the Controlling the Assault of Non-Solicited Pornography and Marketing Act of 2003, the Children's Online Privacy Protection Act, the Computer Fraud and Abuse Act, the Electronic Communications Privacy Act, the Fair Credit Reporting Act, the Fair and Accurate Credit Reporting Act, HIPAA, the Gramm-Leach-Bliley Act, state data security Laws, state social security number protection Laws, state data breach notification Laws, state consumer protection Laws, and other applicable data protection laws of the jurisdictions in which the Business is operated.

"<u>Intellectual Property</u>" means all of the following in any jurisdiction throughout the world: (a) all inventions (whether patentable or unpatentable and whether or not reduced to practice), all improvements thereto, and all patents, patent applications, and patent disclosures, together with all reissuances, continuations, continuations-in-part, revisions, extensions, and reexaminations thereof, (b) all trademarks, service marks, trade dress, logos, slogans, trade names, corporate names, Internet domain names, internet and social media handles and accounts, and rights in telephone numbers, together with all translations, adaptations, derivations, and combinations thereof and including all goodwill associated therewith, and all applications, registrations, and renewals in connection therewith, (c) all copyrightable works, all copyrights, and all applications, registrations, and renewals in connection therewith, (d) all mask works and all applications, registrations, and renewals in connection therewith, (e) all trade secrets and confidential business information (including ideas, research and development, know-how, technical data, designs, drawings, specifications, customer, lender, municipality and supplier lists, pricing and cost information, and business and marketing plans and proposals), (f) all computer software (including source code, executable code, data, databases and related documentation), (g) all advertising and promotional materials, (h) all other proprietary rights, and (i) all copies and tangible embodiments thereof (in whatever form or medium).

"<u>Knowledge</u>" means actual knowledge after reasonable investigation.

"<u>Leased Real Property</u>" means all leasehold or subleasehold estates and other rights to use or occupy any land, buildings, structures, improvements, fixtures or other interest in real property held by Seller.

"<u>Leases</u>" means all leases, subleases, licenses, concessions and other agreements (written or oral), including all amendments, extensions, renewals, guaranties and other agreements with respect thereto, pursuant to which Seller holds any Leased Real Property, including the right to all security deposits and other amounts and instruments deposited by or on behalf of Seller thereunder.

"<u>Liability</u>" means any liability (whether known or unknown, whether asserted or unasserted, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated, and whether due or to become due), including any liability for Taxes.

"<u>Most Recent Fiscal Year End</u>" means December 31, 2020.

"<u>Ordinary Course of Business</u>" means the ordinary course of business consistent with past custom and practice (including with respect to quantity and frequency).

"<u>Party</u>" has the meaning set forth in the preface above.

DocuSign Envelope ID: 4265D572-8A56-410B-836B-E1E4CB9D56B1

"Person" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization, or a governmental entity (or any department, agency, or political subdivision thereof).

"Personal Data" means any and all information that can reasonably be associated with an individual natural person, including information that identifies an individual natural person, including name, physical address, telephone number, email address, financial account number, passwords or PINs, device identifier or unique identification number, government-issued identifier (including Social Security number and driver's license number), medical, health or insurance information, gender, date of birth, educational or employment information, religious or political views or affiliations and marital or other status (to the extent any of these data elements can reasonably be associated with an individual natural person). Personal Data also includes any information not listed above if such information is defined as "personal data," "personally identifiable information," "individually identifiable health information," "protected health information" or "personal information" under any applicable law and is regulated by such law.

"Proprietary Rights" has the meaning set forth in Section 4(l) below.

"Protected Information" means (a) Personal Data or (b) any information that is governed or regulated by one or more Information Privacy and Security Laws that Seller receives, creates, transmits or maintains in electronic form through any of Seller's systems, networks or other information technology systems.

"Purchase Price" has the meaning set forth in Section 2(c) below.

"Security Interest" means any mortgage, pledge, lien, encumbrance, charge, or other security interest, *other than* (a) mechanic's, materialmen's, and similar liens, (b) liens for Taxes not yet due and payable or for Taxes that the taxpayer is contesting in good faith through appropriate proceedings, (c) purchase money liens and liens securing rental payments under capital lease arrangements, and (d) other liens arising in the Ordinary Course of Business and not incurred in connection with the borrowing of money.

"Subsidiary" means any entity with respect to which a specified Person (or a Subsidiary thereof) owns a majority of the equity interest or has the power to vote or direct the voting of sufficient securities to elect a majority of the members of the governing body.

"Seller" has the meaning set forth in the preface above.

"Tax" means any federal, state, local, or foreign income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental (including taxes under Code §59A), customs duties, capital stock, franchise, profits, withholding, social security (or similar), unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated, or other tax of any kind whatsoever, including any interest, penalty, or addition thereto, whether disputed or not.

"Tax Return" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

2.      Basic Transaction.

(a)      Purchase and Sale of Assets.  On and subject to the terms and conditions of this Agreement, Buyer agrees to purchase from Seller, and Seller agrees to sell, transfer, convey, and deliver to Buyer, all of the Acquired Assets at the Closing to be effective as of the Closing Date, for the consideration specified below in this Section 2.

DocuSign Envelope ID: 4265D572-8A56-410B-836B-E1E4CB9D56B1

(b)    No Liabilities Assumed. Buyer and Seller agree that Buyer is not, by the execution and performance of this Agreement, or otherwise, assuming, agreeing to hold Seller or its parents, subsidiaries or affiliates harmless from, or otherwise assuming responsibility for any debts, liabilities or obligations of Seller of any kind or nature whatsoever, or claims made with respect to any such debts, liabilities or obligations, whether matured or unmatured, liquidated or unliquidated, fixed or contingent, or known or unknown, or arising out of occurrences prior to, at or after the Effective Date, all of which shall be discharged by Seller.

(c)    Purchase Price. In consideration of the purchase of the Acquired Assets, Buyer agrees to pay Seller a purchase price in the amount of Seventy-Five Thousand Dollars ($75,000.00) (the "Purchase Price"), of which Twenty-Five Thousand Dollars ($25,000.00) shall be paid in cash at closing, and the Buyer shall execute a promissory note in the principal amount of $50,000.00 to be paid over a period of thirty-six (36) months with simple interest at the rate of 3% per annum (the "Note"). Buyer shall deposit $10,000.00 (the "Deposit") into the trust account of counsel for Seller, Markowitz Ringel Trusty & Hartog, PA within 2 business days of the execution of this Agreement. The balance of the Purchase Price shall be paid by Buyer to Seller at the Closing by check or wire transfer of immediately available funds at the time of Closing.

(d)    The Closing. The closing of the transactions contemplated by this Agreement (the "Closing") shall take place by electronic exchange of documents within five (5) business days of the Sale Order becoming final and not appealable, Date or such other date as the Parties may mutually determine (the "Closing Date").

(e)    Deliveries at the Closing. At the Closing, (i) Seller will execute and deliver to Buyer the various certificates, instruments, and documents required hereunder including but not limited to (A) the Bill of Sale attached hereto as Exhibit C; (B) the Assignment and Assumption Agreement attached hereto as Exhibit D (the "Assignment Agreement"); the Seller Non-Solicitation and Non-Competition Agreement attached hereto as Exhibit E (the "Seller Non-Solicitation Agreement"); (C) a Written Consent of the Shareholders of Seller authorizing the transactions; (D) a Written Consent of the Board of Directors of Seller authorizing the transactions; (e) a Officer's Certificate of Seller; (f) a closing certificate of Seller; and (g) such other instruments of sale, transfer, conveyance, and assignment as Buyer and its counsel may request; (ii) Elizabeth Karwowski will execute and deliver to Buyer the Karwowski Non-Competition and Non-Solicitation Agreement attached hereto as Exhibit F (the "Karwowski Non-Solicitation Agreement"); (iii) Buyer will execute and deliver to Seller the various certificates, instruments, and documents required hereunder including but not limited to (A) the Assignment Agreement, (B) the Seller Non-Solicitation Agreement; and (c) a closing certificate of Buyer; (iv) Buyer will execute and deliver to Karwowski the Karwowski Non-Solicitation Agreement;; and (v) Buyer will deliver to Seller the consideration specified in Section 2(c) above.

(f)    Allocation. The Parties agree to allocate the Purchase Price (and all other capitalizable costs) among the Acquired Assets for all purposes (including financial accounting and tax purposes) in the manner reasonably determined by Buyer. Subject to adjustment at the Closing, the amount of $25,000.00 shall be allocated towards those Acquired Assets necessary for the operations of Seller's business. The balance of the Purchase Price shall be allocated to those amounts necessary to satisfy administrative and other costs of Seller's bankruptcy estate.

3.    Bankruptcy Court Matters.

(a)    Bankruptcy Cases. On or before  March 5, 2021, Seller shall file a voluntary petition for reorganization (the "Bankruptcy Cases") with the United States Bankruptcy Court for the Southern District of Florida (the "Bankruptcy Court") pursuant to Chapter 11 of the Bankruptcy Code. The date on which the petition is filed with the Bankruptcy Court shall be herein defined as the "Petition Date."

(b)    Sale Motion. Seller shall file with the Bankruptcy Court on the Petition Date, a motion or motions (the "Sale Motion") seeking the Bankruptcy Court's approval of (i) an order (the "Bidding

DocuSign Envelope ID: 4265D572-8A56-410B-836B-E1E4CB9D56B1

Procedures Order") that, among other things, establishes procedures for an auction process to solicit competing bids, and (ii) an order (the "Sale Order") that, among other things, approves this Agreement, and the sale, transfer and assignment of the Acquired Assets by Seller to Buyer, pursuant to sections 105, 363 and 365 of the Bankruptcy Code. Both the Bidding Procedures Order and the Sale Order must be in all material respects in forms and substance reasonably acceptable to Buyer. Seller shall file true, correct and complete copies of this Agreement with the Sale Motion. The Sale Motion shall request, among other things, the scheduling of (i) the date for an auction (the "Auction") to be (a) conducted by the Seller for the sale of the Acquired Assets if, and only if, any competing pre-qualified bid is received pursuant to the Bidding Procedures Order, and (b) commenced no later than 60 days after the Petition Date and (ii) the date, which shall be no more than two (2) business days after the Auction, for the hearing (the "Sale Hearing") to consider entry of the Sale Order.

          (c)    Sale Order. Seller shall use reasonable best efforts to obtain entry of the Sale Order approving the transactions contemplated by this Agreement and granting, among other things, that (i) such sale, transfer and conveyance shall be, to the fullest extent permitted by the Bankruptcy Code and pursuant to Bankruptcy Code sections 105, 363(b) and 363(f), free and clear of all Encumbrances, (ii) all Contracts required to be assumed by Seller and assigned to Buyer are so assumed and assigned free and clear of all Encumbrances, to the fullest extent permitted by Bankruptcy Code section 365, (iii) Buyer is deemed to have purchased the Acquired Assets in good faith pursuant to Bankruptcy Code section 363(m), and (iv) Seller is authorized and directed to execute, upon request by Buyer, one or more assignments in form, substance and number reasonably acceptable to Buyer, evidencing the sale, transfer and conveyance of the Acquired Assets to Buyer, and/or its designees.

          (d)    Assumption and Assignment.

          (i)    Seller shall assume and assign to Buyer the Assigned Contracts. Buyer may, at any time and in its sole discretion, designate additional Contracts to be assumed by Seller and assigned to Buyer. Seller shall use reasonable best efforts to obtain entry of a Bankruptcy Court order (the "Assumption Order"), which Assumption Order may be the Sale Order, (i) authorizing, pursuant to Bankruptcy Code sections 105, 363 and 365, Seller to assume and assign to Buyer the Assigned Contracts, and any other Contract so designated by Buyer, and (ii) fixing the amounts required by Bankruptcy Code section 365(b)(1) (the "Cure Costs"). Buyer shall be responsible for all Cure Costs in an amount not to exceed $10,000.00. Buyer, with the reasonable cooperation and assistance of Seller, will provide adequate assurance of future performance under each assigned Contract. Seller shall not assume or reject any Contract without the prior written consent of Buyer.

          (ii)    Procedure. Subject to its obligations as a debtor-in-possession, Seller shall promptly make any filings, take all actions and use reasonable best efforts to obtain all relief from the Bankruptcy Court that is necessary or appropriate to consummate the transactions contemplated by this Agreement. Seller shall provide Buyer with drafts of all papers and proposed orders to be filed or submitted in connection with this Agreement for Buyer's prior review and comment and shall cooperate with Buyer to make reasonable changes thereto. Seller agrees to diligently prosecute the entry of the Bidding Procedures Order, the Sale Order and the Assumption Order. In the event the entry of the Bidding Procedures Order, the Sale Order and/or the Assumption Order is/are appealed, Seller shall use its reasonable best efforts to oppose such appeal(s). Notwithstanding the foregoing, any resulting changes to this Agreement, the Bidding Procedures Order, the Sale Order or the Assumption Order shall be subject to Buyer's approval, in its sole discretion.

          4.    Representations and Warranties of Seller. Seller represents and warrants to Buyer that the statements contained in this Section 4 are correct and complete as of the Execution Date, and will be correct and complete as of the Effective Date (as though made then and as though the Effective Date were substituted for the Execution Date throughout this Section 4), except as set forth in the disclosure schedule accompanying this Agreement (the "Disclosure Schedule"). The Disclosure Schedule will be arranged in paragraphs corresponding to the lettered and numbered paragraphs contained in this Section 4.

DocuSign Envelope ID: 4265D572-8A56-410B-836B-E1E4CB9D56B1

(a)     Organization of the Seller.  Seller is a corporation duly organized, validly existing, and in good standing under the laws of the State of Florida.

(b)     Authorization of Transaction.  Subject to Bankruptcy Court approval, Seller has full power and authority (including full corporate power and authority) to execute and deliver this Agreement and to perform its obligations hereunder. Without limiting the generality of the foregoing, the board of directors or other governing body of Seller and the shareholders of Seller have duly authorized the execution, delivery, and performance of this Agreement by Seller. Subject to Bankruptcy Court approval, this Agreement constitutes the valid and legally binding obligation of Seller, enforceable in accordance with its terms and conditions.

(c)     Noncontravention.  Neither the execution and the delivery of this Agreement, nor the consummation of the transactions contemplated hereby (including the assignments and assumptions referred to in Section 2 above), will (i) violate any constitution, statute, regulation, rule, injunction, judgment, order, decree, ruling, charge, or other restriction of any government, governmental agency, or court to which Seller is subject or any provision of the Articles or Certificate of Incorporation, Bylaws or other governing document of Seller or (ii) conflict with, result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify, or cancel, or require any notice under any agreement, contract, lease, license, instrument, or other arrangement to which Seller is a party or by which it is bound or to which any of its assets is subject (or result in the imposition of any Security Interest upon any of its assets). Other than approval of the Bankruptcy Court, Seller does not need to give any notice to, make any filing with, or obtain any authorization, consent, or approval of any government or governmental agency in order for the Parties to consummate the transactions contemplated by this Agreement (including the assignments and assumptions referred to in Section 2 above).

(d)     Brokers' Fees.  Seller has no Liability or obligation to pay any fees or commissions to any broker, finder, or agent with respect to the transactions contemplated by this Agreement for which Buyer could become liable or obligated.

(e)     Title to Assets and Condition.  Seller owns and will transfer to Buyer at the Closing good, marketable and indefeasible title to all of the Acquired Assets, free and clear of all liens, claims and encumbrances. The Acquired Assets will be transferred on an "as is" "where is" basis and Seller makes no representations or warranties as to fitness for Buyer's intended use of the Acquired Assets.

(f)     Subsidiaries.  Seller has no Subsidiaries.

(g)     Financial Statements.  The financial information provided by Seller to Buyer (the "Financial Statements") have been provided in the same condition as maintained by Seller, and are, to the best of Seller's knowledge, consistent with the books and records of Seller. Buyer is conducting its own, independent diligence and not relying upon any representations made by Seller in connection with this Agreement as to Seller's financial condition.

(h)     Events Subsequent to Most Recent Fiscal Year End.  Since the Most Recent Fiscal Year End, other than the commencement of the Bankruptcy Case, there has not been any material adverse change in the business, financial condition, operations, results of operations, or future prospects of Seller. Without limiting the generality of the foregoing, since that date:

(i)     Seller has not sold, leased, transferred, or assigned any of its assets, tangible or intangible, other than for a fair consideration in the Ordinary Course of Business;

(ii)     Seller has not entered into any agreement, contract, lease, or license (or series of related agreements, contracts, leases, or licenses) pursuant to which it became or will become indebted for more than $5,000.00 or outside the Ordinary Course of Business;

DocuSign Envelope ID: 4265D572-8A56-410B-836B-E1E4CB9D56B1

       (iii)     Seller has not accelerated, terminated, modified, or cancelled any agreement, contract, lease, or license (or series of related agreements, contracts, leases, or licenses) to which Seller is a party or by which it is bound;

       (iv)     Seller has not granted any Security Interest(s) in any of its assets, tangible or intangible;

       (v)     Seller has not issued any note, bond, or other debt security or created, incurred, assumed, or guaranteed any indebtedness for borrowed money or capitalized lease obligation;

       (vi)     Intentionally Omitted;

       (vii)     Seller has not cancelled, compromised, waived, or released any right or claim (or series of related rights and claims) outside the Ordinary Course of Business;

       (viii)     Seller has not granted any license or sublicense of any rights under or with respect to any Intellectual Property, other than to Buyer under that Source Code License Agreement effective as of February 11, 2021;

       (ix)     there has been no change made or authorized in the Articles or Certificate of Incorporation, Bylaws or other governing agreement of Seller;

       (x)     Seller has not issued, sold, or otherwise disposed of any of its equity, or granted any options, warrants, or other rights to purchase or obtain (including upon conversion, exchange, or exercise) any of its equity;

       (xi)     Seller has not declared, set aside, or paid any dividend or made any distribution with respect to its equity (whether in cash or in kind) or redeemed, purchased, or otherwise acquired any of its equity;

       (xii)     Seller has not experienced any damage, destruction, or loss (whether or not covered by insurance) to its property, provided however, that if there has been damage, destruction or loss to its property, the same have been corrected, or is represented not to have been material;

       (xiii)     Seller has not made any loan to, or entered into any other transaction with, any of its managers, officers, and employees outside the Ordinary Course of Business;

       (xiv)     Seller has not made or pledged to make any charitable or other capital contribution outside the Ordinary Course of Business;

       (xv)     there has not been any other material occurrence, event, incident, action, failure to act, or transaction outside the Ordinary Course of Business involving Seller other than the filing of the Bankruptcy Case and matters associated with the Bankruptcy Case; and

       (xvi)     Seller has not committed to any of the foregoing.

    (i)     Intentionally Omitted

    (j)     _Legal Compliance_. Seller and its predecessors have complied with all applicable laws (including rules, regulations, codes, plans, injunctions, judgments, orders, decrees, rulings, and charges thereunder) of federal, state, local, and foreign governments (and all agencies thereof), and no criminal or

DocuSign Envelope ID: 4265D572-8A56-410B-836B-E1E4CB9D56B1

administrative action, suit, proceeding, hearing, investigation, charge, complaint, claim, demand, or notice has been filed or commenced against any of them alleging any failure so to comply.

      (k)    <u>Tax Matters</u>.

      (i)    Seller has filed all Tax Returns that it was required to file, other than for calendar year 2020. All such Tax Returns were correct and complete in all respects. All Taxes owed by Seller (whether or not shown on any Tax Return) have been paid. Seller is not currently the beneficiary of any extension of time within which to file any Tax Return. No claim has ever been made by an authority in a jurisdiction where Seller does not file Tax Returns that it is or may be subject to taxation by that jurisdiction. There are no Security Interests on any of the assets of Seller that arose in connection with any failure (or alleged failure) to pay any Tax.

      (ii)    Seller has withheld and paid all Taxes required to have been withheld and paid in connection with amounts paid or owing to any employee, independent contractor, creditor, stockholder, or other third party.

      (iii)    Seller does not expect any authority to assess any additional Taxes for any period for which Tax Returns have been filed. There is no dispute or claim concerning any Tax Liability of Seller either (A) claimed or raised by any authority in writing, or (B) as to which the directors and officers (and employees responsible for Tax matters) of Seller have Knowledge based upon personal contact with any agent of such authority.

      (l)    <u>Intellectual Property</u>.

      (i)    The Disclosure Schedule sets forth a correct and complete list of certain items of Intellectual Property that are included in the Acquired Assets (the "<u>Proprietary Rights</u>").

      (ii)    Seller owns or possesses adequate licenses or other valid rights to use (without the making of any payment to others or the obligation to grant rights to others in exchange) all the Proprietary Rights. The Proprietary Rights constitute all such rights necessary to conduct the Business in accordance with past practice. The validity of the Proprietary Rights and the rights therein of Seller have not been questioned in any litigation to which Seller is a party, nor has any such litigation been threatened. The Proprietary Rights themselves, and the conduct of the Business using the Proprietary Rights, do not materially conflict with the Intellectual Property Rights of any other Person.

      (iii)    No material use of any Proprietary Rights owned by Seller has heretofore been, or is now being, made by any Person other than Seller. Seller has no Knowledge of any material infringement of any Proprietary Rights owned or licensed by Seller. No present or former director, officer, employee or consultant of Seller has any interest in any of the Proprietary Rights.

      (iv)    All personnel, including employees, agents, consultants, and contractors, who have contributed to or participated in the conception and development of the Proprietary Rights on behalf of Seller either (1) have been party to a "work-for-hire" arrangement or agreement with Seller, in accordance with applicable federal and state law, that has accorded Seller full, effective, exclusive, and original ownership of all tangible and intangible property thereby arising, or (2) have executed appropriate instruments of assignment in favor of Seller as assignee that have conveyed to Seller full, effective, and exclusive ownership of all tangible and intangible property thereby arising.

      (m)    <u>Tangible Assets</u>. The Disclosure Schedule sets forth a correct and complete list of all tangible personal property included in the Acquired Assets. Seller owns or leases all tangible personal property reflected in the Disclosure Schedule, including all buildings, machinery, equipment, and other tangible assets necessary for the conduct of its business as presently conducted and as presently proposed to be conducted. All

DocuSign Envelope ID: 4265D572-8A56-410B-836B-E1E4CB9D56B1

tangible personal property in Seller's possession is free from defects (patent and latent), has been maintained in accordance with normal industry practice, is in good operating condition and repair (subject to normal wear and tear), and is suitable for the purposes for which it presently is used and presently is proposed to be used.

(n)     Intentionally Omitted.

(o)     Contracts. The Disclosure Schedule sets forth each of the contracts and agreements to which Seller is a party as of the Execution Date and the Effective Date, including but not limited to any agreement for the lease of personal property to or from any Person; the lease of Real Property to or from any Person; any agreement (or group of related agreements) for the purchase or sale of raw materials, commodities, supplies, inventories, products, or other personal property, or for the furnishing or receipt of services; any agreement concerning a partnership, strategic alliance or joint venture; any agreement under which it has created, incurred, assumed, or guaranteed any indebtedness for borrowed money, or any capitalized lease obligation; any agreement concerning confidentiality or noncompetition; any agreement involving the Members; any profit sharing, equity option, equity purchase, equity appreciation, deferred compensation, severance, or other material plan or arrangement for the benefit of its current or former directors, officers, and employees; and any agreement for the employment of any individual on a full-time, part-time, consulting, or other basis.

The Seller has delivered to the Buyer a correct and complete copy of each written agreement listed in Section 4(o) of the Disclosure Schedule (as amended to date) and a written summary setting forth the terms and conditions of each oral agreement referred to in Section 4(o) of the Disclosure Schedule. With respect to each such agreement: (A) the agreement is legal, valid, binding, enforceable, and in full force and effect; (B) the agreement will continue to be legal, valid, binding, enforceable, and in full force and effect on identical terms following the consummation of the transactions contemplated hereby (including the assignments and assumptions referred to in Section 2 above); (C) no party is in breach or default, and no event has occurred which with notice or lapse of time would constitute a breach or default, or permit termination, modification, or acceleration, under the agreement; and (D) no party has repudiated any provision of the agreement.

(p)     Powers of Attorney. There are no outstanding powers of attorney executed on behalf of Seller.

(q)     Insurance. Seller has maintained in full force and effect all policies of insurance applicable to Seller, including property and casualty, cyber security insurance, premises and general liability insurance and employer's liability and workers' compensation insurance. A summary of the Seller's insurance coverage is included in Section 4(q) of the Disclosure Schedule.

(r)     Litigation. Section 4(r) of the Disclosure Schedule sets forth each instance in which the Seller (i) is subject to any outstanding injunction, judgment, order, decree, ruling, or charge or (ii) is a party or, to the Knowledge of any of the directors, officers (and employees with responsibility for litigation matters) of Seller, is threatened to be made a party to any action, suit, proceeding, hearing, or investigation of, in, or before any court or quasi-judicial or administrative agency of any federal, state, local, or foreign jurisdiction or before any arbitrator. No director or officer (or employee with responsibility for litigation matters) of Seller has any reason to believe that any such action, suit, proceeding, hearing, or investigation may be brought or threatened against Seller.

(s)     Product and Services Liability. Seller does not have any Liability (and to the Knowledge of any of the directors and officers (and employees with responsibility for litigation matters) there is no Basis for any present or future action, suit, proceeding, hearing, investigation, charge, complaint, claim, or demand against Seller giving rise to any Liability) arising out of any injury to individuals or property as a result of the ownership, possession, or use of any product or services provided by Seller.

DocuSign Envelope ID: 4265D572-8A56-410B-836B-E1E4CB9D56B1

(t)    <u>Employees and Employee Benefits</u>. Seller has frozen or terminated any and all Employee Benefit Plans that Seller maintained prior to the Effective Date; and Seller is not a party to or obligated under any other pension, profit sharing, deferred compensation, bonus, retirement, welfare benefit, medical, life insurance or any other written or oral plans covering employees of Seller. To Seller's Knowledge, Seller has complied with all applicable provisions of ERISA and all applicable federal, state and local laws relating to the employment of labor, including, but not limited to, the provisions thereof relative to wages, hours, collective bargaining, contributions to pension or benefit plans, and payment of Social Security taxes, and Seller is not liable for any arrears of wages or any taxes or penalties for failure to comply with any of the foregoing. Seller is not a party to or bound by any collective bargaining agreement, nor has Seller experienced any strikes, grievances, claims of unfair labor practices or other collective bargaining disputes. Seller shall have sole and exclusive responsibility for any duties and obligations owed to Seller's employees as of the Effective Date, including any and all accrued vacation, bonuses, pension and retirement plan obligations and other benefits; Buyer is not assuming any of such obligations.

(u)    <u>Guaranties</u>. Seller is not a guarantor or otherwise liable for any Liability or obligation (including indebtedness) of any other Person.

(v)    <u>Environmental, Health, and Safety Matters</u>. Seller and its predecessors have complied and is currently in compliance with all Environmental, Health, and Safety Requirements.

(w)    <u>Certain Business Relationships With Seller</u>.  Except as set forth on Section 4(w) of the Disclosure Schedule, the shareholders and directors of Seller have not been involved in any business arrangement or relationship with Seller within the past 12 months other than as shareholders, directors and employees, and the shareholders of Seller do not own any asset, tangible or intangible, which is used in the Business.

(x)    <u>Privacy and Data Protection</u>.

(i)    Within the five (5) year period prior to the Effective Date, Seller's receipt, collection, maintenance, transmission, use, analysis, disclosure, storage and disposal of Protected Information and, to the Knowledge of Seller, any such activities performed by authorized third parties on Seller's behalf, has complied in all material respects with (i) applicable Information Privacy and Security Laws and (ii) all applicable policies and procedures (which meet or exceed applicable industry standards) adopted by Seller relating to Protected Information. Seller has obtained all material consents and authorizations necessary to receive, access, use and disclose the Protected Information in its possession or under its control in connection with the operation of the Business.

(ii)    Within the five (5) year period prior to the Effective Date, there has been no material data security breach or unauthorized access to, as the case may be, any of Seller's material systems, networks or information technology that transmits or maintains Protected Information or other incidents involving the unauthorized access, acquisition, use or disclosure of any Protected Information, owned, used, maintained or controlled by a Seller, including any such unauthorized access, acquisition, use or disclosure of Protected Information that would, to the Knowledge of Seller, constitute a breach for which notification to individuals and/or governmental entities is required under any applicable Information Privacy and Security Laws or agreements to which Seller is a party. To the Knowledge of Seller, none of Seller's vendors, suppliers and subcontractors, or Sellers, have (i) suffered any breach that has resulted in any unauthorized access to, use of, disclosure of or other loss of any Protected Information, (ii) materially breached any agreements with Seller relating to Protected Information or (iii) materially violated any Information Privacy and Security Laws.

(iii)    Within the five (5) year period prior to the Effective Date, Seller has implemented and maintained a written information security program reasonably designed to (i) identify and address material internal and external risks to the security of any proprietary or confidential information in its possession, including Protected Information, (ii) implement administrative, technical and physical safeguards

DocuSign Envelope ID: 4265D572-8A56-410B-836B-E1E4CB9D56B1

to control such risks, and (iii) maintain notification procedures in compliance with applicable Information Privacy and Security Laws in the case of any applicable breach of security compromising data containing Protected Information. Seller made available to Buyer true and complete copies of all currently effective privacy policies under which any Seller collects, uses or stores any Protected Information.

(iv)    Within the five (5) year period prior to the Effective Date, no Person has (i) provided a written notice or audit request to Seller, (ii) made any written claim against Seller or (iii) to the Knowledge of Seller, commenced any action, suit, proceeding, hearing, investigation, charge, complaint, claim, demand, or notice against Seller or any party acting on behalf of Seller, in each case, with respect to (A) any alleged violation of Information Privacy and Security Laws by Seller or any authorized third party acting on Seller's behalf or (B) any of Seller's privacy or data security practices, including any loss, damage or unauthorized access, acquisition, use, disclosure, modification or other misuse of any Protected Information maintained by or on behalf of Seller. The execution, delivery, and performance of this Agreement will not cause, constitute, or result in a breach or violation of any contractual obligation of Seller relating to Protected Information.

(y)    Disclosure.  The representations and warranties contained in this Section 4 do not contain any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements and information contained in this Section 4 not misleading.

5.    Representations and Warranties of Buyer.  Buyer represents and warrants to Seller that the statements contained in this Section 5 are correct and complete as of the Execution Date and will be correct and complete as of the Effective Date (as though made then and as though the Effective Date were substituted for the Execution Date throughout this Section 5), except as set forth in the Disclosure Schedule. The Disclosure Schedule will be arranged in paragraphs corresponding to the lettered and numbered paragraphs contained in this Section 5.

(a)    Organization of Buyer.  Buyer is a limited liability company duly organized, validly existing, and in good standing under the laws of the jurisdiction of its organization.

(b)    Authorization of Transaction.  Buyer has full power and authority (including full limited liability company power and authority) to execute and deliver this Agreement and to perform its obligations hereunder. This Agreement constitutes the valid and legally binding obligation of Buyer, enforceable in accordance with its terms and conditions.

(c)    Noncontravention.  Neither the execution and the delivery of this Agreement, nor the consummation of the transactions contemplated hereby (including the assignments and assumptions referred to in Section 2 above), will (i) violate any constitution, statute, regulation, rule, injunction, judgment, order, decree, ruling, charge, or other restriction of any government, governmental agency, or court to which Buyer is subject or any provision of its Certificate of Organization or Operating Agreement, or (ii) conflict with, result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify, or cancel, or require any notice under any agreement, contract, lease, license, instrument, or other arrangement to which Buyer is a party or by which it is bound or to which any of its assets is subject. Buyer does not need to give any notice to, make any filing with, or obtain any authorization, consent, or approval of any government or governmental agency in order for the Parties to consummate the transactions contemplated by this Agreement (including the assignments and assumptions referred to in Section 2 above).

(d)    Brokers' Fees.  Buyer has no Liability or obligation to pay any fees or commissions to any broker, finder, or agent with respect to the transactions contemplated by this Agreement for which Seller could become liable or obligated.

DocuSign Envelope ID: 4265D572-8A56-410B-836B-E1E4CB9D56B1

     (e)    Buyer's Abilities. Buyer represents that it and its personnel have the knowledge, skill set, and ability necessary to meet Seller's obligations and fulfill Seller's duties under the contracts that Seller is assigning to Buyer and which are enumerated in the Assignment and Assumption Agreement.

     (f)    Retention of Personnel. Buyer represents that it will retain those employees and independent contractors of the Seller as specified by Buyer on the Closing Date.

    6.    Pre-Closing Covenants. The Parties agree as follows with respect to the period between the Execution Date and the Closing Date.

     (a)    General. Each of the Parties will use its reasonable best efforts to take all action and to do all things necessary, proper, or advisable in order to consummate and make effective the transactions contemplated by this Agreement (including satisfaction, but not waiver, of the closing conditions set forth in Section 7 below).

     (b)    Notices and Consents. Seller will give any notices to third parties, and Seller will use its reasonable best efforts to obtain any third party consents, that the Buyer may request in connection with the matters referred to in Section 4(c) above. Each of the Parties will give any notices to, make any filings with, and use its reasonable best efforts to obtain any authorizations, consents, and approvals of governments and governmental agencies in connection with the matters referred to in Section 4(c) and 5(c) above.

     (c)    Operation of Business. Seller will not engage in any practice, take any action, or enter into any transaction outside the Ordinary Course of Business. Without limiting the generality of the foregoing, Seller will not (i) declare, set aside, or pay any dividend or make any distribution with respect to its capital stock or redeem, purchase, or otherwise acquire any of its capital stock, or (ii) otherwise engage in any practice, take any action, or enter into any transaction of the sort described in Section 4(h) above.

     (d)    Preservation of Business. Seller will keep its business and properties substantially intact, including its present operations, physical facilities, working conditions, and relationships with lessors, licensors, suppliers, customers, and employees.

     (e)    Full Access. Seller will permit representatives of the Buyer to have full access at all reasonable times to all premises, properties, personnel, books, records (including Tax records), contracts, and documents of or pertaining to Seller.

     (f)    Notice of Developments. Each Party will give prompt written notice to the other Party of any material adverse development causing a breach of any of its own representations and warranties in Sections 4 and 5 above. No disclosure by any Party pursuant to this Section 6(f), however, shall be deemed to amend or supplement the Disclosure Schedule or to prevent or cure any misrepresentation, breach of warranty, or breach of covenant.

     (g)    Exclusivity. Except as otherwise required by law, Seller will not (i) solicit, initiate, or encourage the submission of any proposal or offer from any Person relating to the acquisition of any capital stock or other voting securities, or any substantial portion of the assets, of Seller (including any acquisition structured as a merger, consolidation, or share exchange) or (ii) participate in any discussions or negotiations regarding, furnish any information with respect to, assist or participate in, or facilitate in any other manner any effort or attempt by any Person to do or seek any of the foregoing. Seller will notify Buyer immediately if any Person makes any proposal, offer, inquiry, or contact with respect to any of the foregoing.

    7.    Conditions to Obligation to Close. The obligation of Buyer to consummate the transactions to be performed by it in connection with the Closing is subject to satisfaction of the following conditions:

DocuSign Envelope ID: 4265D572-8A56-410B-836B-E1E4CB9D56B1

(a)     the representations and warranties set forth in Section 4 above shall be true and correct in all material respects at and as of the Closing Date;

(b)     Seller shall have performed and complied with all of its covenants hereunder in all material respects through the Closing;

(c)     Seller shall have procured all of the third party consents specified in Section 6(b) above;

(d)     no action, suit, or proceeding shall be pending or threatened before any court or quasi-judicial or administrative agency of any federal, state, local, or foreign jurisdiction or before any arbitrator wherein an unfavorable injunction, judgment, order, decree, ruling, or charge would (A) prevent consummation of any of the transactions contemplated by this Agreement, (B) cause any of the transactions contemplated by this Agreement to be rescinded following consummation, or (C) affect adversely the right of Buyer to own the Acquired Assets, to operate the Business;

(e)     Buyer shall have delivered to the Buyer a certificate to the effect that each of the conditions specified above in Section 7(a)-(d) is satisfied in all respects;

(f)     Buyer shall have obtained on terms and conditions satisfactory to it all of the financing it needs in order to consummate the transactions contemplated hereby and fund the working capital requirements of the Business after the Closing;

(g)     Buyer shall have made all of the closing deliveries specified in Section 2(e); and

(h)     all actions to be taken by Seller in connection with consummation of the transactions contemplated hereby and all certificates, opinions, instruments, and other documents required to effect the transactions contemplated hereby will be satisfactory in form and substance to Buyer.

8.     Post-Closing Covenants. The Parties agree as follows with respect to the period following the Closing.

(a)     General.  In case at any time after the Closing any further action is necessary or desirable to carry out the purposes of this Agreement, each of the Parties will take such further action (including the execution and delivery of such further instruments and documents) as any other Party reasonably may request, all at the sole cost and expense of the requesting Party.  Seller acknowledges and agrees that from and after the Closing, Buyer will be entitled to possession of all documents, books, records (including Tax records), agreements, and customer, vendor and financial data of any kind relating to Seller; however, Seller shall be permitted to retain and use copies of all documents, books, records and data that may be necessary to comply with its obligations as a debtor in possession in the Bankruptcy Case and otherwise wind down its affairs.

(b)     Litigation Support.  In the event and for so long as any Party actively is contesting or defending against any action, suit, proceeding, hearing, investigation, charge, complaint, claim, or demand in connection with (i) any transaction contemplated under the Agreement or (ii) any fact, situation, circumstance, status, condition, activity, practice, plan, occurrence, event, incident, action, failure to act, or transaction on or prior to the Closing Date involving Buyer or Seller, each of the other Parties will cooperate with the contesting or defending Party and his or its counsel in the contest or defense, make available his or its personnel, and provide such testimony and access to his or its books and records as shall be necessary in connection with the contest or defense, all at the sole cost and expense of the contesting or defending Party.

(c)     Transition.  Seller will not take any action that is designed or intended to have the effect of discouraging any lessor, licensor, governmental agency, customer, supplier, or other business

DocuSign Envelope ID: 4265D572-8A56-410B-836B-E1E4CB9D56B1

associate of Seller from maintaining the same business relationships with Buyer after the Closing as it maintained with Seller prior to the Closing. Seller shall refer all customer inquiries relating to the business of Seller to Buyer from and after the Closing.

(d)    Confidentiality.  Seller will treat and hold as such all of the Confidential Information, refrain from using any of the Confidential Information except in connection with this Agreement, and deliver promptly to the disclosing party or destroy, at the request and option of Buyer, all tangible embodiments (and all copies) of the Confidential Information which are in its possession. In the event that Seller is requested or required (by oral question or request for information or documents in any legal proceeding, interrogatory, subpoena, civil investigative demand, or similar process) to disclose any Confidential Information, such party will notify Buyer promptly of the request or requirement so that Buyer may seek an appropriate protective order or waive compliance with the provisions of this Section 8(d). If, in the absence of a protective order or the receipt of a waiver hereunder, Seller is, on the advice of counsel, compelled to disclose any Confidential Information to any tribunal or else stand liable for contempt, it may disclose the Confidential Information to the tribunal; *provided, however*, that it shall use its reasonable best efforts to obtain, at the reasonable request of Buyer, an order or other assurance that confidential treatment will be accorded to such portion of the Confidential Information required to be disclosed as Buyer shall designate.

(e)    Tax Clearance Certificate.  Seller shall promptly apply for, diligently pursue the issuance of and promptly deliver to Buyer of a Certificate of Compliance or Tax Clearance Letter, as applicable, from the State of Florida.

(f)    Change of Corporate Name.  Seller shall change its corporate name within thirty (30) days after the Closing and shall transfer to Buyer its corporate name for use as either a corporate or fictitious name by Buyer.

(g)    Transfer of Internet Domain Names, Websites and Social Media Accounts.  Seller shall promptly take such actions as requested by Buyer to transfer Seller's internet domain names, websites and social media accounts to Buyer or to a person or entity designated by Buyer.

9.    Termination.

(a)    Termination by Seller. Seller may terminate this Agreement at any time prior to the Closing Date if:

(i)    Buyer materially breaches any obligation or covenant to be performed by it pursuant to this Agreement or any Transaction Document, and such breach has not been cured within ten (10) business days following Buyer's receipt of written notice of such breach from Seller; or

(ii)    Any of the conditions to Seller's obligations have not been satisfied as of the Closing Date and Seller has not waived such condition in writing on or before the Closing Date.

(b)    Termination by Buyer.  Buyer may terminate this Agreement at any time prior to the Closing Date if:

(i)    Seller materially breaches any obligation or covenant to be performed by it pursuant to this Agreement and such breach has not been cured within ten (10) business days following Buyer's receipt of written notice of such breach from Buyer;

(ii)    Any of the conditions to Buyer's obligations have not been satisfied as of the Closing Date and Seller has not waived such condition in writing on or before the Closing Date;

DocuSign Envelope ID: 4265D572-8A56-410B-836B-E1E4CB9D56B1

(iii)    The Bidding Procedures Order, in all material respects in form and substance reasonably acceptable to Buyer, has not been entered by the Bankruptcy Court within 30 days of the Petition Date (or such later date as Buyer may have designated in writing to Seller);

(iv)    The Auction has not commenced on or before 60 days after the Petition Date (or such later date as Buyer may have designated in writing to Seller);

(v)    The Sale Order, in all material respects in form and substance reasonably acceptable to Buyer, has not been entered by the Bankruptcy Court within 70 days of the Petition Date (or such later date as Buyer may have designated in writing to Seller);

(vi)    The Closing has not occurred by May 31, 2021 and such failure to close is not caused by or the result of Buyer's breach of this Agreement;

(vii)    Buyer is not determined to be the winning bidder at the Auction under the Bidding Procedures Order; or

(viii)    Prior to the Closing Date, the Bankruptcy Case is dismissed, converted to a case under Chapter 7 of the Bankruptcy Code, or the Seller is no longer a debtor in possession in the Bankruptcy Case.

(c)    <u>Mutual Termination</u>. The parties may terminate this Agreement at any time prior to the Closing Date by mutual written consent.

(d)    <u>Failure To Close</u>. Either party may terminate this Agreement by giving the other party written notice at termination in the event that the Closing does not occur by May 31, 2021 through no fault of such party; provided that in such a case, the Deposit shall be immediately returned to the Buyer thereunder.

(e)    <u>Effect of Termination</u>. In the event that the Agreement is terminated in accordance with Section 9(a), this Agreement shall terminate and the Deposit shall be immediately returned to Buyer, and Buyer shall retain any and all rights and remedies attendant to a breach by Seller under this Agreement. If this Agreement is terminated in accordance with Section 9(c), this Agreement shall terminate and each party shall be relieved of its respective duties and obligations under this Agreement after the date of such termination and the Deposit shall be immediately returned to Buyer. If this Agreement is terminated by Seller pursuant to Section 9(d), Seller's sole remedy against Buyer shall be to retain the Deposit.

10.    <u>General Provisions</u>.

(a)    <u>No Third-Party Beneficiaries</u>. This Agreement shall not confer any rights or remedies upon any Person other than the Parties and their respective successors and permitted assigns.

(b)    <u>Entire Agreement</u>. This Agreement (including the documents referred to herein) constitutes the entire agreement between the Parties and supersedes any prior understandings, agreements, or representations by or between the Parties, written or oral, to the extent they relate in any way to the subject matter hereof.

(c)    <u>Succession and Assignment</u>. This Agreement shall be binding upon and inure to the benefit of the Parties named herein and their respective successors and permitted assigns. No Party may assign either this Agreement or any of its rights, interests, or obligations hereunder without the prior written approval of the other Party.

DocuSign Envelope ID: 4265D572-8A56-410B-836B-E1E4CB9D56B1

(d)     Counterparts.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together will constitute one and the same instrument.

(e)     Headings.  The section headings contained in this Agreement are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Agreement.

(f)     Notices.  All notices, requests, consents and other communications given or made pursuant to this Agreement shall be in writing and shall be deemed effectively given: (a) upon personal delivery, (b) when sent by confirmed email (with a clear notation at the top of the email in conspicuous type indicating that the email constitutes notice under this Agreement with a specific reference to the full title of this Agreement), if sent during normal business hours of the recipient and if not so confirmed, then on the next business day, (c) one (1) business day after the business day of deposit with a nationally recognized courier, specifying next day delivery with written verification of receipt, in each case to the intended recipient. All communications shall be sent to the respective parties at the addresses set forth below (or at such other addresses as shall be specified by notice given in accordance with this Section 9(f)):

*If to Seller*:
Get Credit Healthy, Inc.
4581 Weston Road, Unit 162
Weston, Florida 33331
Email: ek@getcredithealthy.com

*Copy to:*
Grace E. Robson
Markowitz Ringel Trusty & Hartog, P.A.
101 NE Third Avenue, Suite 1210
Fort Lauderdale, FL 33301
Email: grobson@mrthlaw.com

*If to Buyer:*
CredEvolv Services LLC
16194 Camden Lakes Circle
Naples, FL 34110
Email: romano212@hotmail.com

*With a required copy to:*
Robert J. Borghese
Borghese Law Firm LLC
1845 Walnut Street, Suite 1100
Philadelphia, PA  19103
Email: rjb@borgheselaw.com

(g)     Governing Law. This Agreement shall be governed by and construed in accordance with the domestic laws of the State of Florida without giving effect to any choice or conflict of law provision or rule that would cause the application of the laws of any jurisdiction other than the State of Florida.

(h)     Amendments and Waivers.  No amendment of any provision of this Agreement shall be valid unless the same shall be in writing and signed by Buyer and Seller.  No waiver by any Party of any default, misrepresentation, or breach of warranty or covenant hereunder, whether intentional or not, shall be deemed to extend to any prior or subsequent default, misrepresentation, or breach of warranty or covenant hereunder or affect in any way any rights arising by virtue of any prior or subsequent such occurrence.

(i)     Severability.  Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.

(j)     Expenses.  Each of Buyer and Seller will bear its own costs and expenses (including legal fees and expenses) incurred in connection with this Agreement and the transactions contemplated hereby. Without limiting the generality of the foregoing, all transfer, documentary, sales, use, stamp, registration and other such Taxes, and all conveyance fees, recording charges and other fees and charges (including any penalties and interest) incurred in connection with the consummation of the transactions contemplated by this Agreement, shall be paid by Seller when due, and Seller shall at its own expense, file all necessary Tax Returns and other documentation with respect to all such Taxes, fees and charges, and, if required by applicable law, the Parties will, and will cause their affiliates to, join in the execution of any such Tax Returns and other documentation.

DocuSign Envelope ID: 4265D572-8A56-410B-836B-E1E4CB9D56B1

(k)     Construction. The Parties have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.  Any reference to any federal, state, local, or foreign statute or law shall be deemed also to refer to all rules and regulations promulgated thereunder, unless the context requires otherwise. The word "including" shall mean including without limitation. Nothing in the Disclosure Schedule shall be deemed adequate to disclose an exception to a representation or warranty made herein unless the Disclosure Schedule identifies the exception with particularity and describes the relevant facts in detail. Without limiting the generality of the foregoing, the mere listing (or inclusion of a copy) of a document or other item shall not be deemed adequate to disclose an exception to a representation or warranty made herein (unless the representation or warranty has to do with the existence of the document or other item itself). The Parties intend that each representation, warranty, and covenant contained herein shall have independent significance. If any Party has breached any representation, warranty, or covenant contained herein in any respect, the fact that there exists another representation, warranty, or covenant relating to the same subject matter (regardless of the relative levels of specificity) which the Party has not breached shall not detract from or mitigate the fact that the Party is in breach of the first representation, warranty, or covenant.

(l)     Incorporation of Exhibits and Schedules. The Exhibits and Schedules identified in this Agreement are incorporated herein by reference and made a part hereof.

(m)     Submission to Jurisdiction. Each of the Parties submits to the jurisdiction of the Bankruptcy Court, or federal court with appellate jurisdiction over the Bankruptcy Case, in any action or proceeding arising out of or relating to this Agreement and agrees that all claims in respect of the action or proceeding may be heard and determined in any such court.  Each Party also agrees not to bring any action or proceeding arising out of or relating to this Agreement in any other court.  Each Party agrees that a final judgment in any action or proceeding so brought shall be conclusive and may be enforced by suit on the judgment or in any other manner provided by law or in equity.

[SIGNATURE PAGE FOLLOWS]

DocuSign Envelope ID: 4265D572-8A56-410B-836B-E1E4CB9D56B1

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the Execution Date.

GET CREDIT HEALTHY, INC.

By: _Elizabeth Karwowski_____
Name: Elizabeth Karwowski
Title: President


CREDEVOLV SERVICES LLC

By: _____
Name: Stephen Romano
Title: President

DocuSign Envelope ID: 4265D572-8A56-410B-836B-E1E4CB9D56B1

**DISCLOSURE SCHEDULE**

DocuSign Envelope ID: 4265D572-8A56-410B-836B-E1E4CB9D56B1

## DISCLOSURE SCHEDULE

This Disclosure Schedule is arranged in paragraphs corresponding to the lettered and numbered sections contained in Section 4 of the Asset Purchase Agreement, dated March 5, 2021 (the "Agreement"), by and between CredEvolv Services LLC, a Delaware limited liability company ("Buyer"), and Get Credit Healthy, Inc., a Florida corporation ("Seller").

Capitalized terms used but not defined in this Disclosure Schedule have the meanings given to them in the Agreement. Any information disclosed in the Disclosure Schedule under any section number will be deemed to be disclosed and incorporated in the Disclosure Schedule under any other section to the extent the relevance of such information to such other section would be reasonably apparent to a reader of such information.

DocuSign Envelope ID: 4265D572-8A56-410B-836B-E1E4CB9D56B1

### Section 4(c)
### Noncontravention

Seller and third party, the US Small Business Administration (the "SBA") executed a Loan Authorization and Agreement on June 14, 2020 (the "SBA Loan"). Pursuant to that SBA Loan, Seller granted the SBA a security interest in collateral (the "Collateral) defined by the SBA Loan as all tangible and intangible personal property, including, but not limited to:

(a) inventory
(b) equipment
(c) instruments, including promissory notes
(d) chattel paper, including tangible chattel paper and electronic chattel paper
(e) documents
(f) letter of credit rights
(g) accounts, including health-care insurance receivables and credit card receivables
(h) deposit accounts
(i) commercial tort claims
(j) general intangibles, including payment intangibles and software
(k) as-extracted collateral as such terms may from time to time be defined in the Uniform Commercial Code.

The SBA perfected its security interest in the Collateral by filing a UCC-1 financing statement in Florida on June 29, 2020. Pursuant to Section 5 of the security agreement that the Seller executed as part of the SBA Loan, Seller is precluded from transferring any of the aforementioned Collateral without the SBA's written approval. Failure to seek and obtain such approval would constitute a default under the terms of the SBA Loan and would allow the SBA to accelerate the balance due.

DocuSign Envelope ID: 4265D572-8A56-410B-836B-E1E4CB9D56B1

**Section 4(e)**
**Title to Assets and Condition**

Seller's assets are currently encumbered by the SBA's perfected security interest as set forth in Seller's disclosure pursuant to Section 4(c).

DocuSign Envelope ID: 4265D572-8A56-410B-836B-E1E4CB9D56B1

**Section 4(h)(ii)**
**Events Subsequent to Most Recent Fiscal Year End**

On February 24, 2021, Seller executed a promissory note in favor of Bank of America, N.A. for a PPP loan in the amount of $68,475.00, all of which is eligible for forgiveness ("the "PPP Loan").

DocuSign Envelope ID: 4265D572-8A56-410B-836B-E1E4CB9D56B1

**Section 4(I)(i)**
**Intellectual Property**

The following is a correct and complete list of all Intellectual Property to be included in the Acquired Assets:

1. All software developed by and for Seller that Seller utilizes to provide services to its clients, including the "Source Code", as defined in the Source Code Licensing Agreement, executed by and between Buyer and Seller on February 12, 2021 (the "Software").

2. All platforms, systems, or processes that utilize or depend on the Software to operate, function, or for any other purpose.

3. Usernames, passwords, and any other information necessary to access any local or cloud-based databases to which Seller has access

4. All trademarks including:
   NCAGE Code 5Z7N9
   Serial No. 85854638
   Reg. No. 4406985

5. The name, "Get Credit Healthy", and any other trade name used by Seller including related logos and emblems

6. All of Seller's websites, internet domain names, associated accounts, and email addresses including:

   i. www.getcredithealthy.com
   ii. www.gchuniversity.com
   iii. www.gch360.com

7. All of Seller's social media accounts and handles including:
   i. Facebook
   ii. Instagram
   iii. Twitter
   iv. LinkedIn

8. All of Seller's telephone numbers and extensions thereto including:
   i. (877) 850-3444
   ii. (305) 676-2221
   iii. (305) 239-9894
   iv. (305) 203-0291
   v. (305) 363-6179
   vi. (305) 290-4790
   vii. (305) 204-6835

DocuSign Envelope ID: 4265D572-8A56-410B-836B-E1E4CB9D56B1

        viii.    (954) 320-6337
         ix.    (305) 363-1029
          x.    (305) 570-2731

9. All lists which include contact information or other relevant information about Seller's clients, customers, vendors, or any other entity with which Seller currently has a business relationship or with which Seller is in the process of attempting to establish a business relationship.

10. Any other Intellectual Property that Buyer deems integral to the operation of Seller's business.

DocuSign Envelope ID: 4265D572-8A56-410B-836B-E1E4CB9D56B1

**Section 4(l)(iii)**
**Intellectual Property**

Seller has granted non-exclusive, non-transferable, revocable licenses to access and utilize its Intellectual Property via licensing agreements with the following entities:

1. Starting Now Corporation
2. James Valley Housing
3. Annie Mac Home Mortgage
4. Homestead Funding Corp.
5. Equity Prime Mortgage, LLC
6. Summerlin Financial, Inc.
7. Embrace Home Loans, Inc
8. CrossCountry Mortgage, LLC

DocuSign Envelope ID: 4265D572-8A56-410B-836B-E1E4CB9D56B1

**Section 4(m)**
**Tangible Assets**

The following is a list of all tangible personal property to be included in the Acquired Assets
(Buyer acknowledges that the Company does not currently have access to these assets but will
use its best efforts to recover these assets if requested by Buyer):

| Quantity | Description |
|----------|-------------|
| 2 | Upholstered chairs (entrance) |
| 1 | light wood credenza (entrance) |
| 2 | potted artificial plants (entrance) |
| 1 | Shredder box  (main hallway) |
| 1 | large desk  (accounting office) |
| 1 | small desk (accounting office) |
| 1 | 2-drawer file cabinet (accounting office) |
| 2 | visitor chair (accounting office) |
| 1 | dining table  (kitchenette) |
| 6 | chairs (kitchenette) |
| 1 | large credenza (kitchenette) |
| 2 | mini fridge (kitchenette) |
| 1 | large metal filing cabinet (kitchenette) |
| 1 | large desk (CEO office) |
| 1 | bookshelf (CEO office) |
| 1 | small drawer unit (CEO office) |
| 2 | visitor chairs (CEO office) |
| 1 | Security camera system |
| 1 | Monitor for  security system |
| 2 | small desks (processing office) |
| 4 | small drawer unit (processing office) |
| 1 | large potted artificial plant |
| 1 | large table  (conference room) |
| 6 | Executive chairs (conference room) |
| 1 | 55 inch TV  (conference room) |
| 2 | bookcase/storage unit (conference room) |
| 3 | small desks   (IT room) |
| 1 | large desk (IT room) |
| 3 | small drawer unit |
| 1 | small credenza (outside bathroom) |
| 1 | large desk (back room) |
| 1 | small desk (back room) |
| 1 | large table (sales area) |
| 3 | large desks (sales area) |
| 1 | whiteboard (kitchenette) |
| 1 | whiteboard (processing room) |
| 1 | large whiteboard (sales area) |

DocuSign Envelope ID: 4265D572-8A56-410B-836B-E1E4CB9D56B1

| 1 | large whiteboard (IT room) |
|---|---|
| 1 | large whiteboard (back room) |
| 1 | small whiteboard back room) |
| 1 | small desk (kitchenette) |
| 1 | Filing cabinet (IT office) |

## Section 4(o)
## Contracts

The following is a list of contracts to which Seller is a party as of the Execution Date and the Effective Date:

1. Licensing agreements pursuant to which Seller licenses its Intellectual Property:

   i.     Starting Now Corporation
   ii.    James Valley Housing
   iii.   Annie Mac Home Mortgage
   iv.    Homestead Funding Corp.
   v.     Equity Prime Mortgage, LLC
   vi.    Summerlin Financial, Inc.
   vii.   Embrace Home Loans, Inc
   viii.  CrossCountry Mortgage, LLC

2. Vendor agreements pursuant to which Seller receives services from third party vendors:

   i.     Infusionsoft
   ii.    Infotech
   iii.   FICO Open Access
   iv.    Finlocker

3. Non-disclosure agreements to which Seller is a party:

   i.     KYC Station Ltd.
   ii.    Atlantic Coast Mortgage, LLC
   iii.   Axos Bank
   iv.    CIO Advise, Inc.
   v.     Debt Management Credit Counseling Corp.
   vi.    EGS Consulting, LLC
   vii.   Facet Interactive LLC
   viii.
   ix.    Fulton Financial Corporation
   x.     Stony Lonesome Group LLC
   xi.    NAMMBA Consulting, LLC
   xii.   Broker Solutions, Inc.
   xiii.  Flagstar Bank, FSB
   xiv.   GPL Ventures, Inc.
   xv.    MHHC Enterprises, Inc.
   xvi.   Panorama Mortgage Group, LLC
   xvii.  West Knight Partners, LLC
   xviii.
   xix.   American Pacific Mortgage
   xx.    National Foundation for Credit Counseling

xxi.     Planet Home Lending, LLC
xxii.    Promanage, LLC
xxiii.   GLW Specialty LLC
xxiv.    Sales Boomerang LLC
xxv.     Tect Sect Holdings, LLC dba eCredible.com
xxvi.    Wesbanco Bank, Inc.
xxvii.   Wintrust Mortgage, a Division of Barrington Bank & Trust Company, N.A.
xxviii.
xxix.    Nanette Cohen
xxx.     Fannie Mae
xxxi.    Suzanne Krause
xxxii.   Docitt, Inc.
xxxiii.  Credit Card Management Services, Inc.
xxxiv.   The Mortgage Collaborative Cooperative
xxxv.    Rob Pommier
xxxvi.   Otis Fund, LLC
xxxvii.
xxxviii.
xxxix.   Daniel Bastkowski
xl.      64 Robots, LLC
xli.     Total Expert

4. Employment agreements:

i.    Dave Kelly
ii.   Elizabeth Karwowski

5. Independent contractor agreements:

i.    Pooja Misra
ii.   The Law Offices of Shaun Spector, PLLC
iii.  Florida Multiservices and More, LLC (Henry)

6. Advisory Board agreements:

i.    David Kittle
ii.   Mitch Kider
iii.  Jason Bressler
iv.   Regina Lowrie
v.    Dennis Kelly
vi.   Dan Oran
vii.  Mike Dicenso
viii. Steve Romano (Do not have written agreement)
ix.   Ben Sizemore (Do not have written agreement)

DocuSign Envelope ID: 4265D572-8A56-410B-836B-E1E4CB9D56B1

**Section 4(q)**
**Insurance**

The following is a summary of Seller's current insurance policies:

| Type | Carrier | Term | Policy Number |
|---|---|---|---|
| Professional Liability, Network and Information Security, Media Injury | Evanston Insurance Company | 9/26/20-9/26/21 | MKLV3PEO001375 |
| Workers Compensation and Employers Liability | Travelers | 2/1/21-2/1/22 | 8L669364 |

DocuSign Envelope ID: 4265D572-8A56-410B-836B-E1E4CB9D56B1

**Section 4(r)**
**Litigation**

Seller is currently named as a Defendant is the following cases pending in Broward County, Florida:

| Style | Case Number |
|---|---|
| CSA 8411 LLC v. GET CREDIT HEALTHY, INC. | CONO 20-15912 |
| MORIO MITO v. BETA MUSIC GROUP, INC. and GET CREDIT HEALTHY, INC | CACE 20-016445 |
| ZILBERMAN YONATTAN, et al., v. ELIZABETH KARWOWSKI, et al. | CACE 20-15968 |
| DAN ORAN v. BETA MUSIC GROUP, INC., et al. | CACE 20-019740 |

DocuSign Envelope ID: 4265D572-8A56-410B-836B-E1E4CB9D56B1

**EXHIBIT A**

**ACQUIRED ASSETS**

Tangible Assets

| Quantity | Description |
|---|---|
| 2 | Upholstered chairs (entrance) |
| 1 | light wood credenza (entrance) |
| 2 | potted artificial plants (entrance) |
| 1 | Shredder box  (main hallway) |
| 1 | large desk  (accounting office) |
| 1 | small desk (accounting office) |
| 1 | 2-drawer file cabinet (accounting office) |
| 2 | visitor chair (accounting office) |
| 1 | dining table  (kitchenette) |
| 6 | chairs (kitchenette) |
| 1 | large credenza (kitchenette) |
| 2 | mini fridge (kitchenette) |
| 1 | large metal filing cabinet (kitchenette) |
| 1 | large desk (CEO office) |
| 1 | bookshelf (CEO office) |
| 1 | small drawer unit (CEO office) |
| 2 | visitor chairs (CEO office) |
| 1 | Security camera system |
| 1 | Monitor for  security system |
| 2 | small desks (processing office) |
| 4 | small drawer unit (processing office) |
| 1 | large potted artificial plant |
| 1 | large table  (conference room) |
| 6 | Executive chairs (conference room) |
| 1 | 55 inch TV  (conference room) |
| 2 | bookcase/storage unit (conference room) |
| 3 | small desks   (IT room) |
| 1 | large desk (IT room) |
| 3 | small drawer unit |
| 1 | small credenza (outside bathroom) |
| 1 | large desk (back room) |
| 1 | small desk (back room) |
| 1 | large table (sales area) |
| 3 | large desks (sales area) |
| 1 | whiteboard (kitchenette) |
| 1 | whiteboard (processing room) |
| 1 | large whiteboard (sales area) |
| 1 | large whiteboard (IT room) |
| 1 | large whiteboard (back room) |
| 1 | small whiteboard back room) |
| 1 | small desk (kitchenette) |
| 1 | Filing cabinet (IT office) |

DocuSign Envelope ID: 4265D572-8A56-410B-836B-E1E4CB9D56B1

Intellectual Property Assets

11. All software developed by and for Seller that Seller utilizes to provide services to its clients, including the "Source Code", as defined in the Source Code Licensing Agreement, executed by and between Buyer and Seller on February 12, 2021 (the "Software").

12. All platforms, systems, or processes that utilize or depend on the Software to operate, function, or for any other purpose.

13. Usernames, passwords, and any other information necessary to access any local or cloud-based databases to which Seller has access

14. All trademarks including:
NCAGE Code 5Z7N9
Serial No. 85854638
Reg. No. 4406985

15. The name, "Get Credit Healthy", and any other trade name used by Seller including related logos and emblems

16. All of Seller's websites, internet domain names, associated accounts, and email addresses including:

    iv.    www.getcredithealthy.com
    v.    www.gchuniversity.com
    vi.    www.gch360.com

17. All of Seller's social media accounts and handles including:
    v.    Facebook
    vi.    Instagram
    vii.    Twitter
    viii.    LinkedIn

18. All of Seller's telephone numbers and extensions thereto including:
    xi.    (877) 850-3444
    xii.    (305) 676-2221
    xiii.    (305) 239-9894
    xiv.    (305) 203-0291
    xv.    (305) 363-6179
    xvi.    (305) 290-4790
    xvii.    (305) 204-6835
    xviii.    (954) 320-6337
    xix.    (305) 363-1029
    xx.    (305) 570-2731

19. All lists which include contact information or other relevant information about Seller's clients, customers, vendors, or any other entity with which Seller currently has a business relationship or with which Seller is in the process of attempting to establish a business relationship.

20. Any other Intellectual Property that Buyer deems integral to the operation of Seller's business.

DocuSign Envelope ID: 4265D572-8A56-410B-836B-E1E4CB9D56B1

## Excluded Assets

The following assets (Excluded Assets) are explicitly excluded from the assets that are being acquired by Buyer from Seller (the Acquired Assets) pursuant to the Parties' Asset Purchase Agreement, dated March 5, 2021:

1. 2019 Macbook Pro, Serial Number C02CV0G6MD6P.
2. Samsung Computer Monitor, Model Code LC32HG70QQNXZA.
3. Any claims, counterclaims, or causes of action, whether known or unknown, that Seller has or may have against any third party, including, but not limited to all causes of action that may be brought pursuant to Chapter 5 of the Bankruptcy Code.
4. All cash in the Sellers possession or in any depository accounts over which the Seller has control or for which Seller is a signatory.
5. Any tax refunds to which Seller is entitled from any federal, state, municipal, or local government.

DocuSign Envelope ID: 4265D572-8A56-410B-836B-E1E4CB9D56B1

**EXHIBIT B**

**ASSIGNED CONTRACTS**

**CLIENT AGREEMENTS**

| Agreement Title | Parties | Date | Substance |
|---|---|---|---|
| GCH 360 Subscription Agreement | 1. Get Credit Healthy, Inc.<br>2. Starting Now Corporation | 4/16/18 | Grants Starting Now, a non-profit counseling company, a non-exclusive, non-transferable, revocable license to utilize GCH platform and software. |
| NP Master Service Agreement and Subscription Form | 1. Get Credit Healthy, Inc.<br>2. James Valley Housing* | 2/19/20 | Grants James Valley a non-profit counseling company, a non-exclusive, non-transferable, revocable license to utilize GCH platform and software |
| Order Form and Terms of Use | 1. Get Credit Healthy, Inc.<br>2. American Neighborhood Mortgage Acceptance Company LLC d/b/a AnnieMac Home Mortgage* | 9/4/19 | Grants AnnieMac a lender, a non-exclusive, non-transferable, revocable license to utilize GCH platform and software |
| Order Form and Terms of Use | 1. Get Credit Healthy, Inc.<br>2. Homestead Funding Corp. | 3/12/20 | Grants Homestead, a lender, a non-exclusive, non-transferable, revocable license to utilize GCH platform and software |
| Order Form and Terms of Use | 1. Get Credit Healthy, Inc.<br>2. Equity Prime Mortgage LLC | 1/21/20 | Grants Equity Prime, a lender, a non-exclusive, non-transferable, revocable license to utilize GCH platform and software |
| Order Form and Terms of Use | 1. Get Credit Healthy, Inc.<br>2. Summerlin Financial, Inc. | 1/14/20 | Grants Summerlin, a lender, a non-exclusive, non-transferable, revocable license to utilize GCH platform and software |

**\* Need consent from these parties to assign contract**

**VENDOR AGREEMENTS**

| Agreement Title | Parties | Date | Substance |
|---|---|---|---|
| Vendor Agreement | 1. Get Credit Healthy, Inc.<br>2. The Mortgage Collaborative Cooperative | 7/1/19 | TMC promotes GCH to its membership and provides contact information for all members. GCH provides any TMC member a discounted rate in the event that member wishes to access and license GCH's software or platform. |
| Master Service Agreement | 1. Get Credit Healthy, Inc.<br>2. CQ Infotech, Inc. | 6/15/20 | Infotech provides software developments, design, testing, modification, and maintenance for GCH |
| Master Service | 1. Get Credit Healthy, Inc. | 4/22/20 | Finlocker provides a consumer financial |

DocuSign Envelope ID: 4265D572-8A56-410B-836B-E1E4CB9D56B1

| Agreement and Addendum | 2. Finlocker, LLC | | platform that provides consumer data digitalization to GCH |
| --- | --- | --- | --- |

**Need consent from all parties to assign contract**

DocuSign Envelope ID: 4265D572-8A56-410B-836B-E1E4CB9D56B1

**EXHIBIT C**

**BILL OF SALE**

DocuSign Envelope ID: 4265D572-8A56-410B-836B-E1E4CB9D56B1

## BILL OF SALE

KNOW ALL BY THESE PRESENTS, that GET CREDIT HEALTHY, INC., a Florida corporation ("Seller"), in consideration of the sum of Seventy-Five Thousand Dollars ($75,000.00) and certain other valuable consideration paid by CREDEVOLV SERVICES LLC, a Delaware limited liability company ("Buyer") to Seller, the receipt and sufficiency of which is hereby acknowledged, has agreed pursuant to an Asset Purchase Agreement having an effective date as of _____ (the "Asset Purchase Agreement") between Seller and Buyer, to sell, convey, transfer and deliver to Buyer, and by these presents and pursuant to the Asset Purchase Agreement does sell, convey, transfer and deliver unto Buyer the following assets (collectively, the "Acquired Assets"):

All right, title, and interest in and to all of the assets of Seller (except for the Excluded Assets) which in any way are or are intended to be used or usable in the Business, including without limitation those assets listed on Exhibit A and all forms of customer and lender lists, detailed customer and lender databases, the Assigned Contracts, office and all other equipment, inventory, supplies, accounts receivable, customer and lender relationships, contract rights, information processing hardware and platforms, software (including both source and object code), licenses, know-how, operational documentation, Intellectual Property, websites, technology, trade secrets and property interests, the name "Get Credit Healthy," all trade names, registered and unregistered trademarks, copyrights, domain names, telephone numbers, and online and social media accounts and handles which are owned by, licensed to or used by Seller, and all other properties (tangible and intangible), assets and information necessary or used to conduct the Business

Seller represents and warrants to Buyer that Seller is transferring good title to all of the Acquired Assets, to Buyer, free and clear of all liens, claims, encumbrances or other obligations of Seller of any kind or nature. Seller, for itself and its successors and assigns, covenants and agrees to and with Buyer to warrant and defend the transfer of the Acquired Assets sold unto Buyer against all and every person and persons.

Capitalized terms used in this Bill of Sale shall have the meanings ascribed to such terms in the Asset Purchase Agreement, unless otherwise defined herein.

[SIGNATURE PAGE FOLLOWS]

DocuSign Envelope ID: 4265D572-8A56-410B-836B-E1E4CB9D56B1

IN WITNESS WHEREOF, Seller has executed and delivered this Bill of Sale to be effective as of 12:01 A.M. on _____.


Witness:                                                    GET CREDIT HEALTHY, INC.


_____        By: _____
                                                            Name: Elizabeth Karwowski
                                                            Title: President

41

DocuSign Envelope ID: 4265D572-8A56-410B-836B-E1E4CB9D56B1

EXHIBIT A

Tangible Assets

| Quantity | Description |
|---|---|
| 2 | Upholstered chairs (entrance) |
| 1 | light wood credenza (entrance) |
| 2 | potted artificial plants (entrance) |
| 1 | Shredder box  (main hallway) |
| 1 | large desk  (accounting office) |
| 1 | small desk (accounting office) |
| 1 | 2-drawer file cabinet (accounting office) |
| 2 | visitor chair (accounting office) |
| 1 | dining table  (kitchenette) |
| 6 | chairs (kitchenette) |
| 1 | large credenza (kitchenette) |
| 2 | mini fridge (kitchenette) |
| 1 | large metal filing cabinet (kitchenette) |
| 1 | large desk (CEO office) |
| 1 | bookshelf (CEO office) |
| 1 | small drawer unit (CEO office) |
| 2 | visitor chairs (CEO office) |
| 1 | Security camera system |
| 1 | Monitor for  security system |
| 2 | small desks (processing office) |
| 4 | small drawer unit (processing office) |
| 1 | large potted artificial plant |
| 1 | large table  (conference room) |
| 6 | Executive chairs (conference room) |
| 1 | 55 inch TV  (conference room) |
| 2 | bookcase/storage unit (conference room) |
| 3 | small desks   (IT room) |
| 1 | large desk (IT room) |
| 3 | small drawer unit |
| 1 | small credenza (outside bathroom) |
| 1 | large desk (back room) |
| 1 | small desk (back room) |
| 1 | large table (sales area) |
| 3 | large desks (sales area) |
| 1 | whiteboard (kitchenette) |
| 1 | whiteboard (processing room) |
| 1 | large whiteboard (sales area) |
| 1 | large whiteboard (IT room) |
| 1 | large whiteboard (back room) |
| 1 | small whiteboard back room) |
| 1 | small desk (kitchenette) |
| 1 | Filing cabinet (IT office) |

Intellectual Property Assets

DocuSign Envelope ID: 4265D572-8A56-410B-836B-E1E4CB9D56B1

21. All software developed by and for Seller that Seller utilizes to provide services to its clients, including the "Source Code", as defined in the Source Code Licensing Agreement, executed by and between Buyer and Seller on February 12, 2021 (the "Software").

22. All platforms, systems, or processes that utilize or depend on the Software to operate, function, or for any other purpose.

23. Usernames, passwords, and any other information necessary to access any local or cloud-based databases to which Seller has access

24. All trademarks including:
    NCAGE Code 5Z7N9
    Serial No. 85854638
    Reg. No. 4406985

25. The name, "Get Credit Healthy", and any other trade name used by Seller including related logos and emblems

26. All of Seller's websites, internet domain names, associated accounts, and email addresses including:

    vii.    www.getcredithealthy.com
    viii.   www.gchuniversity.com
    ix.     www.gch360.com

27. All of Seller's social media accounts and handles including:
    ix.     Facebook
    x.      Instagram
    xi.     Twitter
    xii.    LinkedIn

28. All of Seller's telephone numbers and extensions thereto including:
    xxi.     (877) 850-3444
    xxii.    (305) 676-2221
    xxiii.   (305) 239-9894
    xxiv.    (305) 203-0291
    xxv.     (305) 363-6179
    xxvi.    (305) 290-4790
    xxvii.   (305) 204-6835
    xxviii.  (954) 320-6337
    xxix.    (305) 363-1029
    xxx.     (305) 570-2731

29. All lists which include contact information or other relevant information about Seller's clients, customers, vendors, or any other entity with which Seller currently has a business relationship or with which Seller is in the process of attempting to establish a business relationship.

30. Any other Intellectual Property that Buyer deems integral to the operation of Seller's business.

DocuSign Envelope ID: 4265D572-8A56-410B-836B-E1E4CB9D56B1

**EXHIBIT D**

**ASSIGNMENT AND ASSUMPTION AGREEMENT**

DocuSign Envelope ID: 4265D572-8A56-410B-836B-E1E4CB9D56B1

## ASSIGNMENT AND ASSUMPTION AGREEMENT

This Assignment and Assumption Agreement (this "Agreement") is made and entered into effective as of _____ (the "Effective Date"), by and between Get Credit Healthy, Inc., a Florida corporation (the "Assignor"), and CredEvolv Services LLC, a Delaware limited liability company (the "Assignee"). All capitalized terms used herein without definition shall have the respective meanings ascribed to them in the Asset Purchase Agreement, as hereinafter defined.

## BACKGROUND

Assignor and Assignee have entered into an Asset Purchase Agreement dated as of _____ (as the same from time to time may be amended, supplemented or modified, the "Asset Purchase Agreement"), pursuant to which Assignor has agreed to sell, and Assignee has agreed to purchase substantially all of the assets of Assignor including but not limited to those assets relating to its financial technology and services business.

Pursuant to the Asset Purchase Agreement, Assignor has agreed to assign to Assignee and Assignee has agreed to assume from Assignor all of Assignor's rights, powers and privileges in certain agreements of Assignor.

## TERMS

NOW, THEREFORE, for and in consideration of the foregoing and of the consideration set forth in the Asset Purchase Agreement, and intending to be legally bound hereby, the parties hereto agree as follows:

1.    <u>Assignment</u>.  Assignor hereby grants, conveys, transfers, sells and assigns to Assignee as of the Effective Date all of Assignor's right, title and interest in and to the agreements listed on <u>Schedule A</u> attached hereto (the "<u>Assigned Agreements</u>") that are a part of the Acquired Assets, as defined in the Asset Purchase Agreement.

2.    <u>Assumption of Agreements</u>.  Assignee hereby covenants with Assignor to assume and perform as of the Effective Date all liabilities and obligations arising out of the Assigned Agreements accruing on and after the Effective Date, and to faithfully perform all the covenants, conditions, agreements and stipulations contained therein.

3.    <u>Intentionally Omitted</u>.

4.    <u>Asset Purchase Agreement</u>.  This Agreement is being executed and delivered as a condition to the Asset Purchase Agreement and is expressly hereby made subject to and shall have the benefits of the respective representations, warranties, covenants, terms, conditions, limitations and other provisions of the Asset Purchase Agreement.

5.    <u>General Provisions</u>.

(a)    <u>Waiver</u>.  Neither the failure nor any delay on the part of any party to exercise any right, remedy, power, or privilege ("<u>Right</u>") under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any Right preclude any other or further exercise of the same or of any other Right, nor shall any waiver of any Right with respect to any occurrence be construed as a waiver of such Right with respect to any other occurrence.  No waiver shall be effective unless it is in writing and is signed by the party asserted to have granted such waiver.

(b)    <u>Survival of Representations and Warranties</u>.  The representations, warranties,

DocuSign Envelope ID: 4265D572-8A56-410B-836B-E1E4CB9D56B1

covenants and agreements made herein by the parties shall survive the Effective Date.

        (c)    <u>Controlling Law</u>.  This Agreement and all questions relating to its validity, interpretation, performance, and enforcement shall be governed by and construed in accordance with the laws of the State of Florida, notwithstanding any conflict-of-laws doctrines to the contrary, and without the aid of any canon, custom, or rule of law requiring construction against the draftsman.

        (d)    <u>Notices</u>.  All notices, requests, consents and other communications given or made pursuant to this Agreement shall be in writing and shall be deemed effectively given: (a) upon personal delivery, (b) when sent by confirmed email (with a clear notation at the top of the email in conspicuous type indicating that the email constitutes notice under this Agreement with a specific reference to the full title of this Agreement), if sent during normal business hours of the recipient and if not so confirmed, then on the next business day, (c) one (1) business day after the business day of deposit with a nationally recognized courier, specifying next day delivery with written verification of receipt, in each case to the intended recipient. All communications shall be sent to the respective parties at the addresses set forth below (or at such other addresses as shall be specified by notice given in accordance with this Section 5(d)):

| | |
|---|---|
| If to Assignor: | Copy to: |
| Get Credit Healthy, Inc. | Grace E. Robson |
| 4581 Weston Road, Unit 162 | Markowitz Ringel Trusty & Hartog, P.A. |
| Weston, Florida 33331 | 101 NE Third Avenue, Suite 1210 |
| Email: ek@getcredithealthy.com | Fort Lauderdale, FL 33301 |
| | Email: grobson@mrtlaw.com |
| | |
| If to Assignee: | With a required copy to: |
| CredEvolv Services LLC | Robert J. Borghese |
| 16194 Camden Lakes Circle | Borghese Law Firm LLC |
| Naples, FL 34110 | 1845 Walnut Street, Suite 1100 |
| Email: romano212@hotmail.com | Philadelphia, PA  19103 |
| | Email: rjb@borgheselaw.com |

        (e)    <u>Execution in Counterparts</u>.  This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original as against any party whose signature appears thereon, and all of which shall together constitute one and the same instrument.  This Agreement shall become binding when one or more counterparts hereof, individually or taken together, shall bear the signatures of all the parties reflected herein as the signatories.

        (f)    <u>Entire Agreement</u>.  This Agreement (including the Exhibits and Schedules attached hereto) along with the Asset Purchase Agreement contains the entire understanding between the parties hereto with respect to the subject matter hereof, and supersedes all prior and contemporaneous agreements and understandings, inducements or conditions, express or implied, oral or written, except as herein contained. The express terms hereof control and supersede any course of performance and/or usage of the trade inconsistent with any of the terms hereof.  This Agreement may not be modified or amended other than by an agreement in writing executed by all parties hereto.

[SIGNATURE PAGE FOLLOWS]

DocuSign Envelope ID: 4265D572-8A56-410B-836B-E1E4CB9D56B1

IN WITNESS WHEREOF, the parties hereto have executed this Agreement on the day and year first above written.

GET CREDIT HEALTHY, INC.

By: _____
Name:
Title:

CREDEVOLV SERVICES LLC

By: _____
Name:
Title:

[SIGNATURE PAGE TO ASSIGNMENT AND ASSUMPTION AGREEMENT]

DocuSign Envelope ID: 4265D572-8A56-410B-836B-E1E4CB9D56B1

**SCHEDULE A**

## CLIENT AGREEMENTS

| Agreement Title | Parties | Date | Substance |
|---|---|---|---|
| GCH 360 Subscription Agreement | 1. Get Credit Healthy, Inc. 2. Starting Now Corporation | 4/16/18 | Grants Starting Now, a non-profit counseling company, a non-exclusive, non-transferable, revocable license to utilize GCH platform and software. |
| NP Master Service Agreement and Subscription Form | 1. Get Credit Healthy, Inc. 2. James Valley Housing* | 2/19/20 | Grants James Valley a non-profit counseling company, a non-exclusive, non-transferable, revocable license to utilize GCH platform and software |
| Order Form and Terms of Use | 1. Get Credit Healthy, Inc. 2. American Neighborhood Mortgage Acceptance Company LLC d/b/a AnnieMac Home Mortgage* | 9/4/19 | Grants AnnieMac a lender, a non-exclusive, non-transferable, revocable license to utilize GCH platform and software |
| Order Form and Terms of Use | 1. Get Credit Healthy, Inc. 2. Homestead Funding Corp. | 3/12/20 | Grants Homestead, a lender, a non-exclusive, non-transferable, revocable license to utilize GCH platform and software |
| Order Form and Terms of Use | 1. Get Credit Healthy, Inc. 2. Equity Prime Mortgage LLC | 1/21/20 | Grants Equity Prime, a lender, a non-exclusive, non-transferable, revocable license to utilize GCH platform and software |
| Order Form and Terms of Use | 1. Get Credit Healthy, Inc. 2. Summerlin Financial, Inc. | 1/14/20 | Grants Summerlin, a lender, a non-exclusive, non-transferable, revocable license to utilize GCH platform and software |

**\* Need consent from these parties to assign contract**

## VENDOR AGREEMENTS

| Agreement Title | Parties | Date | Substance |
|---|---|---|---|
| Vendor Agreement | 1. Get Credit Healthy, Inc. 2. The Mortgage Collaborative Cooperative | 7/1/19 | TMC promotes GCH to its membership and provides contact information for all members. GCH provides any TMC member a discounted rate in the event that member wishes to access and license GCH's software or platform. |
| Master Service Agreement | 1. Get Credit Healthy, Inc. 2. CQ Infotech, Inc. | 6/15/20 | Infotech provides software developments, design, testing, modification, and maintenance for GCH |
| Master Service Agreement and | 1. Get Credit Healthy, Inc. 2. Finlocker, LLC | 4/22/20 | Finlocker provides a consumer financial platform that provides consumer data |

DocuSign Envelope ID: 4265D572-8A56-410B-836B-E1E4CB9D56B1

| Addendum | | digitalization to GCH | |
|---|---|---|---|

**Need consent from all parties to assign contract**

DocuSign Envelope ID: 4265D572-8A56-410B-836B-E1E4CB9D56B1

**EXHIBIT E**

**SELLER NON-SOLICITATION AGREEMENT**

DocuSign Envelope ID: 4265D572-8A56-410B-836B-E1E4CB9D56B1

## NON-COMPETITION AND NON-SOLICITATION AGREEMENT

This NON-COMPETITION AND NON-SOLICITATION AGREEMENT (the "Agreement") is made and entered into effective as of_____ (the "Effective Date"), by and between CREDEVOLV SERVICES LLC, a Delaware limited liability company (the "Company"), and GET CREDIT HEALTHY, INC., a Florida corporation ("GCH").

### BACKGROUND

GCH has owned and operated a financial technology platforms and services business. On _____ _____, GCH and the Company entered into an Asset Purchase Agreement (the "Asset Purchase Agreement") pursuant to which GCH sold substantially all of its assets to the Company including the financial technology platforms and services business.

In partial consideration of and as an express condition precedent to the purchase of the assets, GCH has agreed to keep information concerning the Company confidential, not to engage in competitive activities, not to solicit the Company's clients, customers, lenders, partners, credit counselors, employees or contractors, and to cooperate with the Company in maintaining certain relationships.

### TERMS

NOW, THEREFORE, in consideration of the premises contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, GCH and the Company agree as follows:

1.    Confidential Information.  GCH has confidential and proprietary information concerning its business, strategies, operations, sales, marketing, finances, technology, pricing, vendors, suppliers, clients, customers, lenders, partners, credit counselors, employees, contractors and organizational and personnel matters, policies, procedures and other non-public matters, or concerning those of third parties, all of which information has been transferred to the Company pursuant to the Asset Purchase Agreement (the "Confidential Information"). Without prejudice to or limitation on any other confidentiality obligations imposed by the Asset Purchase Agreement or any other agreement or by law, GCH agrees to hold in the strictest confidence and not to use (or attempt to use), except for the benefit of the Company, and not to disclose to any person or entity without the prior written authorization of the Company, any Confidential Information. Without limiting the foregoing, the existence of, and any information concerning, any dispute between GCH and the Company shall constitute Confidential Information except that GCH may disclose information concerning such dispute to the arbitrator or court that is considering such dispute, or to GCH's legal counsel (provided that such counsel agrees not to disclose any such information other than as necessary to the prosecution or defense of the dispute).

2.    Non-Solicitation of Customers, Lenders, Partners, Credit Counselors, Employees and Contractors; Noncompetition.

(a)    GCH hereby agrees that the Company would likely suffer significant harm from GCH soliciting customers, lenders, partners, credit counselors, employees or contractors of, and competing with, the Company. Accordingly, GCH hereby agrees that for a period of five (5) years commencing on the Effective Date (the "Restrictive Period"), GCH will not, without the express prior express written consent of the Company, either directly or indirectly, on its own behalf or in the service or on behalf of others:

(i)    (A) Solicit (as defined below) any Customer (as defined below) to transact business with a Competitive Enterprise (as defined below) or to reduce or refrain from doing any business with the Company, (B) interfere with or damage (or attempt to interfere with or damage) any relationship between

DocuSign Envelope ID: 4265D572-8A56-410B-836B-E1E4CB9D56B1

the Company and a Customer, or (C) contact or approach any person or entity for either purpose or authorize or knowingly approve the taking of such actions by any other person or entity; or

        (ii)     Solicit any employee or contractor of the Company (whether or not such person is a full-time or part-time employee or contractor) to leave their employment or engagement with the Company, to become employed or engaged by any other person or entity, or to engage in any activity that would cause any such employee or contractor to violate any agreement with the Company, or approach any such employee or contractor for such purpose or knowingly approve of the taking of such action by any other person or entity; or

        (iii)    Whether alone or in conjunction with any other person or entity, including as an owner, partner, stockholder, member, director, manager, officer, consultant, agent, employee, or contractor of any other business enterprise, directly or indirectly engage in any business or activity which is a Competitive Enterprise.

        (b)    For purposes of this Agreement, the following terms shall have the following meanings:

        (i)     "Solicit" means any direct or indirect communication of any kind whatsoever, regardless of by whom initiated, inviting, advising, encouraging or requesting any person or entity in any manner to take or refrain from taking any action.

        (ii)    "Competitive Enterprise" means any business enterprise that (i) engages in any activity or (ii) directly or indirectly owns or controls a significant interest in any person or entity that engages in any activity that, in either case, competes with any activity in which GCH was engaged or the Company or a Company parent, subsidiary or affiliate is then-engaged. The activities covered by the previous sentence include, without limiting the generality of the foregoing, the financial technology platforms and services to a partner network of non-profit FICO and HUD-certified credit counselors and lenders that enable them to assist and provide education to consumers who do not qualify for a variety of financial products because of their credit profiles with the goal of qualifying those consumers for the financial products for which they applied.

        (iii)    "Customer" means (i) any person or entity which at the time of determination is, or was, within five (5) years prior to such time, a person or entity with whom GCH or the Company had a client, customer, lender, partner, credit counselor or other business or strategic relationship, or (ii) any person or entity which at the time of determination (A) had recently contacted or had been recently contacted by GCH or the Company regarding GCH's or the Company's products or services, or (B) who became known to GCH as a prospective client, customer, lender, partner, credit counselor, or other business or strategic relationship of GCH or the Company.

        (c)    The Company may provide a copy of this Section 2 to any person or entity (i) which GCH may directly or indirectly own, manage, operate, finance, join, control or participate in the ownership, management, operation, financing, or control of, or (ii) with which it may be connected as an officer, director, shareholder, manager, member, employee, partner, principal, agent, representative, consultant or otherwise, or in connection with which it may use or permit its name to be used.  GCH agrees to provide the names and addresses of any of such persons or entities as the Company may request from time to time.

    3.     Transfer of Customer Relationships. During the Restrictive Period, GCH hereby agrees to take all actions and do all such things as may be reasonably requested by the Company from time to time to maintain for the Company the business, goodwill, and business relationships with any of the Company's Customers.

    4.     Prior Notice Required. GCH hereby agrees that prior to entering into a consulting, customer

DocuSign Envelope ID: 4265D572-8A56-410B-836B-E1E4CB9D56B1

or other relationship with any other person or entity during the Restrictive Period, GCH will provide such prospective client or customer with written notice of the provisions of this Agreement, with a copy of such notice delivered simultaneously to the Company.

5.    Covenants Generally.

(a)    GCH's covenants as set forth in the preceding sections of this Agreement are from time to time referred to herein as the "Covenants." If any of the Covenants are finally held to be invalid, illegal or unenforceable (whether in whole or in part), such Covenant shall be deemed modified to the extent, but only to the extent, of such invalidity, illegality or unenforceability and the remaining such Covenants shall not be affected thereby; provided, however, that if any of such Covenants is finally held to be invalid, illegal or unenforceable because it exceeds the maximum scope determined to be acceptable to permit such provision to be enforceable, such Covenant will be deemed to be modified to the minimum extent necessary to modify such scope in order to make such provision enforceable hereunder.

(b)    GCH acknowledges and agrees that (i) the Covenants are narrowly tailored to protect the Company's legitimate business interests in protecting the business and goodwill which was purchased from GCH, (ii) that the Covenants may limit GCH's ability to compete in a business similar to the business of the Company but that the Covenants do not impose undue hardship on it, and (iii) that the Covenants are not injurious to the public good.

(c)    GCH acknowledges and agrees that a violation on GCH's part of any of the Covenants would cause irreparable damage to the Company. Accordingly, GCH agrees that the Company may seek injunctive relief for any actual or threatened violation of any of the Covenants in addition to any other remedies it may have.

6.    Injunctive Relief; Submission to Jurisdiction. The Company may bring an action or special proceeding in a state or federal court of Cook County, Illinois or Broward County, Florida of competent jurisdiction for the purpose of temporarily, preliminarily, or permanently enforcing the provisions of this Agreement, including the Covenants, and, for the purposes of this Section 6, GCH (i) expressly consents to the application of Section 7 to any such action or proceeding, (ii) agrees that proof will not be required that monetary damages for breach of the provisions of the Covenants would be difficult to calculate and that remedies at law would be inadequate.

7.    Choice of Forum.

(a)    GCH AND THE COMPANY HEREBY IRREVOCABLY SUBMIT TO THE JURISDICTION OF ANY STATE OR FEDERAL COURT LOCATED IN COOK COUNTY, ILLINOIS, OR BROWARD COUNTY, FLORIDA OVER ANY SUIT, ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO OR CONCERNING THIS AGREEMENT. GCH AND THE COMPANY ACKNOWLEDGE THAT THE FORUM DESIGNATED BY THIS SECTION 7 HAS A REASONABLE RELATION TO THIS AGREEMENT, AND TO GCH'S RELATIONSHIP TO THE COMPANY.

(b)    The agreement of GCH and the Company as to forum is independent of the law that may be applied in the action, and GCH and the Company agree to such forum even if the forum may under applicable law choose to apply non-forum law. GCH and the Company hereby waive, to the fullest extent permitted by applicable law, any objection which GCH or the Company now or hereafter may have to personal jurisdiction or to the laying of venue of any such suit, action or proceeding in any court referred to in Section 7(a). GCH undertakes not to commence any action arising out of or relating to or concerning this Agreement in any forum other than a forum described in this Section 7. GCH agrees that, to the fullest extent permitted by applicable law, a final and non-appealable judgment in any such suit, action or proceeding in any such court shall be conclusive and binding upon GCH.

DocuSign Envelope ID: 4265D572-8A56-410B-836B-E1E4CB9D56B1

8.    Choice of Law. THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF FLORIDA, WITHOUT REGARD TO PRINCIPLES OF CONFLICT OF LAWS.

9.    General Provisions.

(a)    This Agreement shall not supersede any other agreement, written or oral, pertaining to the matters covered herein, except to the extent of any inconsistency between this Agreement and any prior agreement, in which case this Agreement shall prevail.

(b)    Notices hereunder shall be delivered to a party by nationally recognized overnight courier and email at the address specified in the preface to this Agreement.

(c)    This Agreement may not be amended or modified, other than by a written agreement executed by GCH and the Company or its successors, nor may any provision hereof be waived other than by a writing executed by the entity waiving its rights or its successors. GCH may not, directly or indirectly (including by operation of law), assign its rights or obligations hereunder without the prior written consent of the Company or its successors, and any such assignment by GCH in violation of this Agreement shall be void. This Agreement shall be binding upon GCH's permitted successors and assigns. Without impairing GCH's obligations hereunder, the Company may at any time and from time to time assign its rights and obligations hereunder to any of its subsidiaries or affiliates (and have such rights and obligations reassigned to it or to any other subsidiary or affiliate). This Agreement shall be binding upon and inure to the benefit of the Company and its assigns.

(d)    Without limiting the provisions of Section 5(a) hereof, if any provision of this Agreement is finally held to be invalid, illegal or unenforceable (whether in whole or in part), such provision shall be deemed modified to the extent, but only to the extent, of such invalidity, illegality or unenforceability and the remaining provisions shall not be affected thereby.

(e)    Except as expressly provided herein, this Agreement shall not confer on any person other than the Company and GCH any rights or remedies hereunder.

(f)    The captions in this Agreement are for convenience of reference only and shall not define or limit the provisions hereof.

[SIGNATURE PAGE FOLLOWS]

DocuSign Envelope ID: 4265D572-8A56-410B-836B-E1E4CB9D56B1

IN WITNESS WHEREOF, GCH and the Company hereto have caused this Agreement to be executed and delivered on the Effective Date.

CREDEVOLV SERVICES LLC

By: _____
Name:
Title:

GET CREDIT HEALTHY, INC.

By:_____
Name: Elizabeth Karwowski
Title: President

[SIGNATURE PAGE TO NONCOMPETITION AND NONSOLICITION AGREEMENT]

DocuSign Envelope ID: 4265D572-8A56-410B-836B-E1E4CB9D56B1

**EXHIBIT F**

**KARWOWSKI NON-SOLICITATION AGREEMENT**

DocuSign Envelope ID: 4265D572-8A56-410B-836B-E1E4CB9D56B1

## NON-COMPETITION AND NON-SOLICITATION AGREEMENT

This NON-COMPETITION AND NON-SOLICITATION AGREEMENT (the "Agreement") is made and entered into effective as of _____ (the "Effective Date"), by and between CREDEVOLV SERVICES LLC, a Delaware limited liability company (the "Company"), and ELIZABETH KARWOWSKI, an individual ("Karwowski").

### BACKGROUND

Karwowski is a director, officer and employee of Get Credit Healthy, Inc., a Florida corporation ("GCH") which has owned and operated a financial technology platforms and services business. On _____, GCH and the Company entered into an Asset Purchase Agreement (the "Asset Purchase Agreement") pursuant to which GCH sold substantially all of its assets to the Company including the financial technology platforms and services business.

In partial consideration of and as an express condition precedent to the purchase of the assets, Karwowski has agreed to keep information concerning the Company confidential, not to engage in competitive activities, not to solicit the Company's clients, customers, lenders, partners, credit counselors, employees or contractors, and to cooperate with the Company in maintaining certain relationships.

### TERMS

NOW, THEREFORE, in consideration of the premises contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, Karwowski and the Company agree as follows:

1.    Confidential Information.  In the course of her involvement with GCH, Karwowski has obtained confidential and proprietary information concerning GCH's business, strategies, operations, sales, marketing, finances, technology, pricing, vendors, suppliers, clients, customers, lenders, partners, credit counselors, employees, contractors and organizational and personnel matters, policies, procedures and other non-public matters, or concerning those of third parties, all of which information has been transferred to the Company pursuant to the Asset Purchase Agreement (the "Confidential Information"). Without prejudice to or limitation on any other confidentiality obligations imposed by the Asset Purchase Agreement or any other agreement or by law, Karwowski agrees to hold in the strictest confidence and not to use (or attempt to use), except for the benefit of the Company, and not to disclose to any person or entity without the prior written authorization of the Company, any Confidential Information. Without limiting the foregoing, the existence of, and any information concerning, any dispute between Karwowski and the Company shall constitute Confidential Information except that Karwowski may disclose information concerning such dispute to the arbitrator or court that is considering such dispute, or to Karwowski's legal counsel (provided that such counsel agrees not to disclose any such information other than as necessary to the prosecution or defense of the dispute).

2.    Non-Solicitation of Customers, Lenders, Partners, Credit Counselors, Employees and Contractors; Noncompetition.

(a)    In view of Karwowski's importance to GCH and the business of GCH purchased by the Company, Karwowski hereby agrees that the Company would likely suffer significant harm from Karwowski soliciting customers, lenders, partners, credit counselors, employees or contractors of, and competing with, the Company. Accordingly, Karwowski hereby agrees that for a period of three (3) years commencing on the Effective Date (the "Restrictive Period"), Karwowski will not, without the express prior written consent of the Company, either directly or indirectly, on her own behalf or in the service or on behalf of others:

DocuSign Envelope ID: 4265D572-8A56-410B-836B-E1E4CB9D56B1

(i)      (A) Solicit (as defined below) any Customer (as defined below) to transact business with a Competitive Enterprise (as defined below) or to reduce or refrain from doing any business with the Company, (B) interfere with or damage (or attempt to interfere with or damage) any relationship between the Company and a Customer, or (C) contact or approach any person or entity for either purpose or knowingly direct the taking of such actions by any other person or entity; or

(ii)      Solicit any employee or contractor of the Company (whether or not such person is a full-time or part-time employee or contractor) to leave their employment or engagement with the Company, to become employed or engaged by any other person or entity, or to engage in any activity that would cause any such employee or contractor to violate any agreement with the Company, or approach any such employee or contractor for such purpose or knowingly direct the taking of such action by any other person or entity; or

(iii)      Whether alone or in conjunction with any other person or entity, including as an owner, partner, stockholder, member, director, manager, officer, consultant, agent, employee, or contractor of any other business enterprise, directly or indirectly engage in any business or activity which is a Competitive Enterprise.

(b)      For purposes of this Agreement, the following terms shall have the following meanings:

(i)      "Solicit" means any direct or indirect communication of any kind whatsoever, regardless of by whom initiated, inviting, advising, encouraging or requesting any person or entity in any manner to take or refrain from taking any action.

(ii)      "Competitive Enterprise" means any business enterprise that (i) engages in any activity or (ii) directly or indirectly owns or controls a significant interest in any person or entity that engages in any activity that, in either case, competes with any activity in which GCH was engaged or the Company or a Company parent, subsidiary or affiliate is then-engaged. The activities covered by the previous sentence include, without limiting the generality of the foregoing, the financial technology platforms and services to a partner network of non-profit FICO and HUD-certified credit counselors and lenders that enable them to assist and provide education to consumers who do not qualify for a variety of financial products because of their credit profiles with the goal of qualifying those consumers for the financial products for which they applied).

(iii)      "Customer" means (i) any person or entity which at the time of determination is, or was, within five (5) years prior to such time, a person or entity with whom GCH or the Company had a client, customer, lender, partner, credit counselor or other business or strategic relationship, or (ii) any person or entity which at the time of determination (A) had recently contacted or had been recently contacted by GCH or the Company regarding GCH's or the Company's products or services, or (B) who became known to Karwowski in connection with her relationship with GCH or the Company, as a prospective client, customer, lender, partner, credit counselor, or other business or strategic relationship of GCH or the Company.

(c)      The Company may provide a copy of this Section 2 to any person or entity (i) which Karwowski may directly or indirectly own, manage, operate, finance, join, control or participate in the ownership, management, operation, financing, or control of, or (ii) with which she may be connected as an officer, director, shareholder, manager, member, employee, partner, principal, agent, representative, consultant or otherwise, or in connection with which she may use or permit her name to be used.  Karwowski agrees to provide the names and addresses of any of such persons or entities as the Company may request from time to time.

DocuSign Envelope ID: 4265D572-8A56-410B-836B-E1E4CB9D56B1

3.    Transfer of Customer Relationships. During the Restrictive Period, Karwowski hereby agrees to take all actions and do all such things as may be reasonably requested by the Company from time to time to maintain for the Company the business, goodwill, and business relationships with any of the Company's Customers.

4.    Covenants Generally.

(a)    Karwowski's covenants as set forth in the preceding sections of this Agreement are from time to time referred to herein as the "Covenants." If any of the Covenants is finally held to be invalid, illegal or unenforceable (whether in whole or in part), such Covenant shall be deemed modified to the extent, but only to the extent, of such invalidity, illegality or unenforceability and the remaining such Covenants shall not be affected thereby; provided, however, that if any of such Covenants is finally held to be invalid, illegal or unenforceable because it exceeds the maximum scope determined to be acceptable to permit such provision to be enforceable, such Covenant will be deemed to be modified to the minimum extent necessary to modify such scope in order to make such provision enforceable hereunder.

(b)    Karwowski acknowledges and agrees that (i) the Covenants are narrowly tailored to protect the Company's legitimate business interests in protecting the business and goodwill which was purchased from GCH, (ii) that the Covenants may limit Karwowski's ability to earn a livelihood in a business similar to the business of the Company but that the Covenants do not impose undue hardship on her, and (iii) that the Covenants are not injurious to the public good.

(c)    Karwowski acknowledges and agrees that a violation on Karwowski's part of any of the Covenants would cause irreparable damage to the Company. Accordingly, Karwowski agrees that the Company may seek injunctive relief for any actual or threatened violation of any of the Covenants in addition to any other remedies it may have.

6.    Injunctive Relief; Submission to Jurisdiction. The Company may bring an action or special proceeding in a state or federal court located in Cook County, Illinois or Broward County, Florida of competent jurisdiction for the purpose of temporarily, preliminarily, or permanently enforcing the provisions of this Agreement, including the Covenants, and, for the purposes of this Section 6, Karwowski (i) expressly consents to the application of Section 7 to any such action or proceeding, and (ii) agrees that proof will not be required that monetary damages for breach of the provisions of the Covenants would be difficult to calculate and that remedies at law would be inadequate.

7.    Choice of Forum.

(a)    KARWOWSKI AND THE COMPANY HEREBY IRREVOCABLY SUBMIT TO THE JURISDICTION OF ANY STATE OR FEDERAL COURT LOCATED IN COOK COUNTY, ILLINOIS, OR BROWARD COUNTY, FLORIDA OVER ANY SUIT, ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO OR CONCERNING THIS AGREEMENT. KARWOWSKI AND THE COMPANY ACKNOWLEDGE THAT THE FORUM DESIGNATED BY THIS SECTION 7 HAS A REASONABLE RELATION TO THIS AGREEMENT, AND TO KARWOWSKI'S RELATIONSHIP TO THE COMPANY.

(b)    The agreement of Karwowski and the Company as to forum is independent of the law that may be applied in the action, and Karwowski and the Company agree to such forum even if the forum may under applicable law choose to apply non-forum law. Karwowski and the Company hereby waive, to the fullest extent permitted by applicable law, any objection which Karwowski or the Company now or hereafter may have to personal jurisdiction or to the laying of venue of any such suit, action or proceeding in any court referred to in Section 7(a). Karwowski undertakes not to commence any action arising out of or relating to or concerning this Agreement in any forum other than a forum described in this Section 7. Karwowski agrees that, to the fullest extent permitted by applicable law, a final and non-appealable judgment in any such suit,

DocuSign Envelope ID: 4265D572-8A56-410B-836B-E1E4CB9D56B1

action or proceeding in any such court shall be conclusive and binding upon Karwowski.

      8.    <u>Choice of Law</u>. THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF FLORIDA, WITHOUT REGARD TO PRINCIPLES OF CONFLICT OF LAWS.

      9.    <u>General Provisions</u>.

      (a)    This Agreement shall not supersede any other agreement, written or oral, pertaining to the matters covered herein, except to the extent of any inconsistency between this Agreement and any prior agreement, in which case this Agreement shall prevail.

      (b)    Notices hereunder shall be delivered to a party by nationally recognized overnight courier and email at the address specified in the preface to this Agreement.

      (c)    This Agreement may not be amended or modified, other than by a written agreement executed by Karwowski and the Company or its successors, nor may any provision hereof be waived other than by a writing executed by the party waiving its rights or its successors. Karwowski may not, directly or indirectly (including by operation of law), assign her rights or obligations hereunder without the prior written consent of the Company or its successors, and any such assignment by Karwowski in violation of this Agreement shall be void. This Agreement shall be binding upon Karwowski's permitted successors and assigns. Without impairing Karwowski's obligations hereunder, the Company may at any time and from time to time assign its rights and obligations hereunder to any of its subsidiaries or affiliates (and have such rights and obligations reassigned to it or to any other subsidiary or affiliate). This Agreement shall be binding upon and inure to the benefit of the Company and its assigns.

      (d)    Without limiting the provisions of Section 5(a) hereof, if any provision of this Agreement is finally held to be invalid, illegal or unenforceable (whether in whole or in part), such provision shall be deemed modified to the extent, but only to the extent, of such invalidity, illegality or unenforceability and the remaining provisions shall not be affected thereby.

      (e)    Except as expressly provided herein, this Agreement shall not confer on any person other than the Company and Karwowski any rights or remedies hereunder.

      (f)    The captions in this Agreement are for convenience of reference only and shall not define or limit the provisions hereof.

[SIGNATURE PAGE FOLLOWS]

DocuSign Envelope ID: 4265D572-8A56-410B-836B-E1E4CB9D56B1

IN WITNESS WHEREOF, Karwowski and the Company hereto have caused this Agreement to be executed and delivered on the Effective Date.

CREDEVOLV SERVICES LLC

By: _____
Name:
Title:


_____
Name: Elizabeth Karwowski

[SIGNATURE PAGE TO NONCOMPETITION AND NONSOLICITION AGREEMENT]

**EXHIBIT 2**

***PROPOSED ORDER APPROVING SALE***

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FORT LAUDERDALE DIVISION**
www.flsb.uscourts.gov

In re:                                                    Chapter 11

Beta Music Group, Inc. and                Case No. 21-12199-SMG
Get Credit Healthy, Inc.,                     Case No. 21-12201-SMG
                                                            (Jointly Administered)

      Debtors.

_____ /

**ORDER GRANTING DEBTORS' MOTION FOR ENTRY OF AN ORDER**
**(A) AUTHORIZING THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS'**
**ASSETS, FREE AND CLEAR OF ALL LIENS, CLAIMS, AND ENCUMBRANCES, (B)**
**GRANTING THE PURCHASER THE PROTECTIONS AFFORDED TO A GOOD**
**FAITH PURCHASER, AND (C) GRANTING RELATED RELIEF**

THIS MATTER came before this Court on _____, 2021 at _____ a.m./p.m.,

upon the *Debtors' Motion For Entry of (1) An Order Approving (A) Bidding Procedures, (B)*

*Assumption Procedures, (C) the Form and Manner of Notices, (D) Sale Agreements with*

*Stalking Horse Bidder, and (E) Scheduling an Auction, a Sale Hearing, and Establishing Dates*

*and Deadlines Related Thereto; and (2) an Order (A) Authorizing the Sale of Substantially All of*

*the Debtors' Assets, Free and Clear of All Liens, Claims, and Encumbrances, (B) Granting the*

*Purchaser the Protections Afforded to a Good Faith Purchaser, and (C) Granting Related Relief*

(the "Motion") [ECF No. _____]. The Court, having considered the Motion, having considered

the evidence presented by unopposed proffers, argument of counsel, the Court file, representations of counsel, finds good cause to grant the Motion. Accordingly, it is **FOUND AND DETERMINED THAT:**[1]

### Jurisdiction and Venue

A.      This Court has jurisdiction over this case and this proceeding pursuant to 28 U.S.C. § 1334 and the *Order of Reference* entered by the United States District Court for the Southern District of Florida on March 21, 2012. Administrative Order 2012-25.

B.      This is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A), (M), (N) and (O).

C.      Venue of these cases and proceedings is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

### Statutory Predicates

D.      The Motion sought relief pursuant to sections 105, 363, 365 and 1123(a)(5)(D) of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006, 9008, 9014, and Local Rules 6004-1 and 6006-1.

### Background

E.      Beta Music Group, Inc. ("BEMG") and Get Credit Healthy, Inc. ("GCH", and together with BEMG, the "Debtors") filed voluntary petitions under Chapter 11, Title 11 of the United States Code (the "Bankruptcy Code") on March 5, 2021 (the "Petition Date").

F.      As of the Petition Date, GCH was the owner of various software and intellectual property, technology, websites, and other personal property as more fully detailed in its bankruptcy schedules (collectively, the "Assets").

---

[1] Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact to the fullest extent of the law. *See* Fed. R. Bankr. P. 7052.

G.    Prior to the Petition Date, the United States Small Business Administration ("SBA") was the holder of a promissory note and security agreement, as evidenced by the UCC-1 financing statement filed with the State of Florida.

**<u>Notice</u>**

H.    On March ___, 2021, the Debtors filed the Motion seeking to sell the Assets. On March ____ , 2021, the Debtors served a copy of the Motion [ECF No. _____] and *Notice of Hearing* [ECF No. _____] upon all creditors and other parties in interest. *See Certificate of Service*, ECF No. ____. Further, the *Order Approving (A) Bidding Procedures, (B) The Form And Manner Of Notices, (C) Sale Agreements With Stalking Horse Bidder, Including Purchaser Protections And (D) Scheduling An Auction, A Sale Hearing, And Establishing Dates And Deadlines Related Thereto* [ECF No. ____] and the *Notice of Auction and Sale Hearing* were served on all creditors, parties in interest and potential bidders on _____, 2021. *See Certificate(s) of Service* [ECF No. ____].

I.    As evidenced by the certificates of service filed with the Court [ECF Nos. _____], and based upon representations of counsel, due, proper, timely, adequate and sufficient notice of the Motion, the proposed sale of the Assets (the "Sale"), and hearing to approve the Sale has been provided.  All creditors and parties in interest were afforded an opportunity to object and be heard.

J.    On _____, 2021, the Debtors served notices (the "<u>Assumption and Assignment Notices</u>") of the potential assumption and assignment of the Assumed Contracts on the counterparties to such Assumed Contracts, which notices included (i) the Assumed Contracts that could potentially be assumed and assigned, (ii) the name of the counterparties to such Assumed Contracts, (iii) the amount, if any, determined by the Debtors to be necessary to be

3

paid (the "Cure Amounts") as of the date of the Assumption and Assignment Notices upon the assumption of the Assumed Contracts, and (iv) the deadline by which any counterparty to any of the Assumed Contracts must object to the possible assumption by the Debtors and assignment to the Buyer of the Assumed Contracts.  The service of such Assumption and Assignment Notices was good, sufficient, and appropriate under the particular circumstances, and no other or further notice(s) of the assumption and assignment of the Assumed Contracts or the applicable Cure Amounts is/are required.  Each counterparty to the Assumed Contracts has had an opportunity to object to the assumption by the Debtors and the assignment to the Buyer of the Assumed Contracts and to the applicable Cure Amounts set forth in the Assumption and Assignment Notices.

### **Marketing & Business Justification**

K.     On May ____, 2021, the Debtors conducted an auction (the "Auction"), and on May ____, 2021, the Court conducted a hearing on the Motion (the "Hearing").

L.     As demonstrated by (i) the testimony and other evidence proffered or introduced at the Sale Hearing and (ii) the representations of counsel made on the record at the Sale Hearing, the Debtors have fairly marketed the Assets under the circumstances and conducted the related sale process in good faith and in compliance in all respects with the Bidding Procedures and the Bidding Procedures Order.  All interested persons and entities have been afforded a full, fair, and reasonable opportunity to (i) conduct due diligence investigations, (ii) submit bids and to submit higher or otherwise better bids to purchase the Assets, and (iii) object or be heard with respect to the Motion and the relief granted by this Order.  The Bidding Procedures were non-collusive, designed and implemented in good faith, substantively and procedurally fair to all parties, and obtained the highest and best value for the Assets for the Debtors, their creditors, and

the estates. In accordance with the Bidding Procedures, the Debtors determined that the combined bid submitted by the Buyer and reflected in and memorialized by the Sale Agreements is the highest and best bid for the Assets.

M.     The Debtors testified by proffer that they believe the written offer submitted by CredEvolv, LLC or its assigns (the "<u>Buyer</u>") in the amount of $_____, pursuant to the *Asset Purchase Agreement* submitted by the Buyer [as modified at the Auction]*,* including all addendums or modifications thereto (the "<u>Contract</u>") was a fair and reasonable offer, and that the written offer submitted by _____ (the "<u>Back-Up Buyer</u>"), in the amount of $_____, subject to the other terms and conditions in the Commercial Contract it submitted was the next highest and best bid (also referred to as the "<u>Contract</u>" when referring to the Back-Up Buyer).

N.     The Buyer would not have entered into the Contract and would not consummate the transactions contemplated thereby, including, without limitation, the Sale Transaction and the assumption and assignment of the Assumed Contracts, (i) if the transfer of the Assets was not free and clear of all Liens and Claims, and other interests of any kind or nature whatsoever, including, without limitation, rights or claims based on any taxes or successor or transferee liability, or (ii) if the Buyer would, or in the future could, be liable for any such Liens and Claims, and other interests, including, without limitation, rights or claims based on any taxes or successor or transferee liability. The Buyer will not consummate the transactions contemplated by the Contract, including, without limitation, the Sale Transaction and the assumption and assignment of the Assumed Contracts, unless this Court expressly orders that neither the Buyer, nor any of its affiliates, its present or contemplated members, partners, officers, directors or shareholders, or the Assets will have any liability whatsoever with respect to, or be required to

satisfy in any manner, whether at law or equity, or by payment, setoff, or otherwise, directly or indirectly, any Liens and Claims, or other interests, including, without limitation, rights or claims based on any taxes, successor or transferee liability.

O.     The Debtors have demonstrated good, sufficient, and sound business reasons and compelling circumstances to enter into the Contract and to consummate the transactions contemplated thereby, including, without limitation, the Sale Transaction and the assumption and assignment of the Assumed Contracts, and such actions are appropriate and reasonable exercises of the Debtors' business judgment and in the best interests of the Debtors, their estates and creditors, and other parties in interest.  Such business reasons include, but are not limited to, the facts that (i) the Sale Agreements and the terms thereof constitute the highest and best offer for the Assets and provide fair and reasonable consideration for the Assets, (ii) no other entity or group of entities has offered to purchase the Assets for greater economic value to the Debtors or the estates than the Buyer, (iii) the Sale Transaction, under and pursuant to the terms of the Contract, presents the best opportunity to realize the value of the Assets and avoid decline and devaluation of the Assets, (iv) the consideration to be provided by the Buyer under the Contract exceeds the liquidation value of the Assets, and (v) unless the Sale Transaction and all of the other transactions contemplated by the Contract are concluded expeditiously as provided for in the Motion and pursuant to the Contract, recoveries to creditors may be diminished.  The Debtors' determination that the Contract constitutes the highest and best offer for the Assets constitutes a valid and sound exercise of the Debtors' business judgment.

P.     The terms and conditions of the Contract, including, without limitation, the consideration to be realized by the Debtors pursuant to the Contract, are fair and reasonable. Approval of the Motion, the Contract, and the transactions contemplated thereby, including,

without limitation, the Sale Transaction and the assumption and assignment of the Assumed Contracts, is in the best interest of the Debtors, the estates and creditors, and all other parties in interest.

Q.    Upon consideration of the facts of this case, the Court finds that the Debtors' business judgment to sell the Assets is sound.

## Good Faith

R.    The offers submitted by the Buyer and Back-Up Buyer were the result of good faith, arms' length negotiations with the Debtors and bids made at the Auction pursuant to procedures previously approved by the Court.

S.    Neither the Buyer nor Back-Up Buyer is an "insider" of the Debtors (as defined in the Bankruptcy Code). Accordingly, the Buyer and Back-Up Buyer are good faith purchasers entitled to the full protections afforded under 11 U.S.C. § 363(m) and any other applicable or similar provisions under applicable bankruptcy and non-bankruptcy law.  None of the Debtors, the Buyer, or their respective agents, officials, personnel, representatives, and advisors, have engaged in any conduct that would cause or permit the avoidance of the Contract or any of the transactions contemplated thereby, including, without limitation, the Sale Transaction and the assumption and assignment of the Assumed Contracts, or the imposition of costs, fees, expenses, or damages under section 363(n) of the Bankruptcy Code.  Neither the Buyer nor its agents, officials, personnel, representatives, or advisors is/are an "insider" of the Debtors, as that term is defined in section 101(31) of the Bankruptcy Code.

## No Fraudulent Transfer

T.    The consideration to be provided by the Buyer for the Assets pursuant to the Contract (i) is fair and reasonable under the circumstances, (ii) is the highest and best offer for

the Assets, (iii) will provide a greater recovery for the Debtors' creditors and estates than would be provided by any other practical available alternative, and (iv) constitutes reasonably equivalent value and fair consideration.

U.      The Buyer is not a mere continuation of the Debtors or the estates, there is no continuity or common identity between the Buyer and the Debtors, and there is no continuity of enterprise between the Buyer and the Debtors.  The Buyer is not holding itself out to the public as a continuation of the Debtors.  The Buyer is not a successor to the Debtors or the estates, and none of the transactions contemplated by the Contract, including, without limitation, the Sale Transaction or the assumption and assignment of the Assumed Contracts, amounts to a consolidation, merger, or de facto merger of the Buyer with or into the Debtors.  None of the transactions contemplated by the Contract, including, without limitation, the Sale Transaction or the assumption and assignment of the Assumed Contracts, is being undertaken for the purpose of escaping liability for the Debtors' debts or hindering, delaying or defrauding creditors.

## Assumed Contracts

V.      The assumption and assignment of the Assumed Contracts, free and clear of all Liens and Claims, and other interests of any kind or nature whatsoever, pursuant to the terms of this Order is integral to the transactions contemplated by the Contract and is in the best interest of the Debtors, the estates and creditors, and all other parties in interest, and represents a reasonable exercise of the Debtors' sound and prudent business judgment.

W.      Pursuant to the terms of the Contract, by the Closing Date and to the extent necessary, the Debtors shall have: (i) cured or provided adequate assurance of cure of, any monetary default existing as of the Closing Date under any of the Assumed Contracts, within the meaning of section 365(b)(1)(A) of the Bankruptcy Code, and (ii) provided compensation, or

adequate assurance of compensation, to any party for actual pecuniary loss to such party resulting from a monetary default existing as of the Closing Date under any of the Assumed Contracts, within the meaning of section 365(b)(1)(B) of the Bankruptcy Code.

X.    The Buyer has demonstrated adequate assurance of its future performance under the Assumed Contracts within the meaning of sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code.  Pursuant to section 365(f) of the Bankruptcy Code, the Assumed Contracts to be assumed and assigned under the Contract shall be assigned and transferred to, and remain in full force and effect for the benefit of, the Buyer notwithstanding any provision in the contracts or other restrictions prohibiting the assignment or transfer.

**FOR THE FOREGOING REASONS, IT IS ORDERED** as follows:

1.    The Motion is **GRANTED**.

2.    Pursuant to 11 U.S.C. §§ 105, 363, and 365, the Debtors are authorized to sell and transfer to the Buyer (or Back-Up Buyer if the Buyer fails to close) all of Get Credit Healthy, Inc.'s right, title, and interest in the Assets according to the terms of the Contract, free and clear of all liens, claims, encumbrances, and other interests of any kind or nature whatsoever, including, without limitation, rights or claims based on any taxes or successor or transferee liability (collectively, the "Liens"). Any Liens against the Assets will attach to the net proceeds of the sale (after payment of the allowed expenses and payments as authorized by the Court), with the same effect, validity, enforceability and priority of such Liens, if any, as such Liens had against the Assets prior to the sale contemplated in the Contract or as otherwise provided in this Order. Any creditor or party in interest that did not object to the Motion is deemed to have consented to the Motion and Sale. In the event any party fails to release its liens, claims, encumbrances or interests against the Assets, this Court shall enter such further Orders as may be

required to release such Liens from the Assets so as to clear title to the Assets and permit its conveyance free and clear of any such Liens.

3.      At the closing on the Sale, the Debtors are authorized to pay the SBA in the amount of $25,000.00 from the sale proceeds in full satisfaction of its secured claim against Get Credit Healthy, Inc. The SBA shall execute a release of lien or other documents necessary to implement the sale to Buyer free and clear of the SBA's liens, claims and encumbrances on the Assets.

4.      The Debtors and Buyer (or Back-Up Buyer as applicable) are authorized to execute, deliver, perform, consummate, and implement all of the terms and conditions of the Contract, together with all additional instruments and documents that may be necessary or appropriate to effectuate the transactions contemplated by the Contract.

5.      Subject to the Closing terms provided for under the Contract, the transfer of the Assets shall be a legal, valid, and effective transfer of the Property and shall vest the Buyer (or Back-Up Buyer as applicable) with all of Get Credit Healthy's right, title, and interest in the Assets.

6.      The purchase price for the Assets under the Contract constitutes fair market value based upon arms' length negotiations. The Buyer (or Back-Up Buyer as applicable) shall be entitled to the protection of the good faith purchaser for value under 11 U.S.C. § 363(m), if this Order or any authorization contained herein is reversed or modified on appeal.  The sale is not subject to avoidance pursuant to 11 U.S.C. § 363(n).

7.      Upon the Debtor's payment to the SBA at closing of the amounts referenced in paragraph 3, any secured claim filed by the SBA against the Debtor's bankruptcy estate

regarding the Assets shall be deemed satisfied, with no further distributions required with respect to the Assets.

8.      Each and every federal, state, local, municipal, or other governmental agency or department is directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Motion and this Order. **Since the transfer of the Assets to the Buyer is pursuant to the confirmed *Debtors' Joint Plan of Liquidation Dated March ____, 2021* [ECF No. _____], such transfer may not be taxed under any law imposing a stamp tax or similar tax pursuant to 11 U.S.C. § 1146(a).**

9.      The terms of the Contract and this Order will be binding in all respects upon, and will inure to the benefit of the Debtors, Buyer (or Back-Up Buyer, as applicable) and their respective affiliates, successors and assigns, and any affected third parties, notwithstanding any subsequent conversion of this case to a different chapter of the Bankruptcy Code or removal of the Debtor(s) as debtor in possession.

10.     Markowitz Ringel Trusty & Hartog, P.A., counsel for the Debtors is authorized to return any good faith deposit to bidders other than the Buyer and Back-Up Buyer, and is further authorized to return the good faith deposit of the Back-Up Buyer after the 25th day after the entry of this Order.

11.     The 14-day stay of this Order under Bankruptcy Rule 6004(h) is waived.

12.     This Court retains exclusive jurisdiction to: (i) enforce and implement the Contract and any other agreements and instruments executed in connection with the Contract; (ii) compel delivery of possession of the Property to the Buyer (or Back-Up Buyer as applicable); (iii) resolve any disputes, controversies or claims arising out of or relating to the Contract; (iv) interpret, implement and enforce the provisions of this Order.

# # #

**<u>Submitted by:</u>**
Grace E. Robson, Esq.
Markowitz, Ringel, Trusty & Hartog, P.A.
*Attorneys for the Chapter 11 Trustee*
101 NE Third Avenue, Suite 1210
Fort Lauderdale, FL 33301
Tel:    (954) 767-0030

**<u>Copy furnished to:</u>**
Grace E. Robson, Esq.
*(Attorney ROBSON is directed to mail a copy of this Order to all parties in interest and to file a certificate of service).*